## B. Wightman *against* J. Wightman.

Though a marriage with a lunatic, is absolutely void; yet, as well for the sake of the good order of society, as the quiet and relief of the party, its nullity should be declared by the decision of some Court of competent jurisdiction.

And this Court, possessing an exclusive jurisdiction over cases of *lunacy* and *matrimonial causes*, is the proper, and indeed, since there are no *Ecclesiastical Courts* having cognisance of such causes, the only tribunal to afford relief, in such a case, and sustain a suit instituted to pronounce the nullity of the marriage.

Therefore, where a person, insane at the time of her marriage, after her return to a lucid interval, refused to ratify or consummate it, and filed her bill to annul it, this Court decreed the marriage null and void, and the parties absolved from its obligations.

So, where a marriage is unlawful and void, *ab initio*, being contrary to the law of nature, as between persons, ascendants or descendants, in the *lineal* line of consanguinity, or between brothers and sisters, in the *collateral* line, this Court will declare such a marriage, in a suit instituted for that purpose, null and void.

Whether this Court, there being no statute regulating marriages, or defining the prohibited degrees, which render them unlawful, will go further, and declare marriages void between persons in the other degrees of *collateral* consanguinity or affinity ? *Quære.*

THE bill, which was sworn to, stated, that the plaintiff was married to the defendant, on the 5th of *July*, 1814. That, at the time she was married, she was, as she is now informed, and believes, in a state of insanity and mental derangement; and that she should never have consented to the marriage, if she had been in possession of her reason. That she continued insane, as she has been informed, and believes, and so she charged the fact to be, for six months. That she has never lived, or in any manner cohabited with the defendant, as his wife, and can never consent to ratify the marriage. That she has since remained sole, on account

*Feb. 29th.*

1820.

WIGHTMAN
v.
WIGHTMAN.

of the said supposed marriage; and she cannot, in con-science, contract marriage with any man, until that marriage is legally declared void. The plaintiff prayed, that the marriage between her and the defendant, might be declared null and void.

The *answer* of the defendant, which was sworn to, admitted the marriage, and that the plaintiff was, at the time, in an actual state of insanity and mental derangement, as the defendant discovered immediately after the marriage. That the plaintiff refused to live or cohabit with the defendant, and has ever since refused to do so; and he consented that the marriage should be declared null and void, on account of such insanity of the plaintiff.

*S. Ford,* for the plaintiff, and the defendant, in proper person, after signing his acknowledgment before a Master, for that purpose, submitted the case to the Court, on the bill and answer. The case was ordered to be referred to a Master to examine into the truth of the allegations in the bill, and to report the testimony taken by him, with his opinion thereon.

In pursuance of the order of reference, one of the Masters of this Court reported the proof taken before him; and that the defendant had notice of the time and place of the examination, and was present during part of the time. That from the testimony of several witnesses, among whom were the mother and stepfather of the plaintiff, the Master was of opinion, that all the material allegations in the bill were fully proved and established.

The cause was submitted for a final hearing, on the report of the Master, without argument.

THE CHANCELLOR. The fact of insanity of the plaintiff, at the time of the marriage, as charged in the bill, and the fact that the parties have never since lived together, or in any manner cohabited with each other, are proved to my satis-

faction. It follows, as a necessary consequence, from these facts, that the marriage was null and void, from the beginning, by reason of the want of capacity in the plaintiff to contract, and has never since obtained any validity, because the plaintiff has never, since the return of her lucid interval, ratified or consummated it.

It is too plain a proposition to be questioned, that idiots and lunatics are incapable of entering into the matrimonial contract. In *Morrison's* case, before the *Delegates*, (cited in 1 *Bl. Com.* 439. and 1 *Collinson on Lunacy*, 554.) it was held, that the marriage of a lunatic, not being in a lucid interval, was absolutely void. I cite this case, not so much for the rule which it declares, as to show, that though such marriages be, *ipso facto*, void, yet that it is proper that there should be a judicial decision to that effect, by some Court of competent jurisdiction; and that, in *England*, the *Spiritual* Court is the appropriate tribunal. I should presume, that this was all that could have been intended by the common law judges, in *Stiles* v. *West*, (cited in *Sid.* 112.) where it was said, that if an idiot contract marriage, it was good. In *Ash's* case, (*Prec. in Ch.* 203. 1 *Eq. Cas. Abr.* 278. pl. 6.) the marriage of a lunatic was controverted in the *Spiritual* Court, and the Lord Keeper declared, in that case, that if a party contracted marriage when a lunatic, and agreed to it, and consummated it, in a lucid interval, it would be good. In *Smart* v. *Taylor*, (9 *Mod.* 98.) before Lord Ch. *Macclesfield*, it was taken for granted, and assumed as a settled proposition, that marriage by an idiot, (and of course by a lunatic) was to be impeached in *Doctors' Commons*. And in the late case, *ex parte Turing*, (1 *Ves. & Beam.* 140.) it seemed to have been thought necessary, notwithstanding the act of 15 *Geo.* II. c. 30. declaring every marriage of a lunatic void, that there should be a sentence of the Ecclesiastical Court to that effect. This statute could not have been introductory of a new

rule, for every marriage of a lunatic, must have been void at common law, and by the law of reason ; (*Furor contrahi matrimonium non sinit, quia consensu opus est.* Dig. 23. 2. 16. 2.) and Blackstone, (1 *Com.* 439.) considers it, rather in the light of a declaratory law, and made on account of the difficulty of proving the exact state of the party's mind, at the marriage, and, also, on account of some private family reasons.

The fitness and propriety of a judicial decision, pronouncing the nullity of such a marriage, is very apparent, and is equally conducive to good order and decorum, and to the peace and conscience of the party. The only question, then, is, to what Court does the jurisdiction of such a case belong? There must be a tribunal existing with us competent to investigate such a charge, and to afford the requisite relief ; and the power, I apprehend, must reside in this Court, which has not only an exclusive jurisdiction over cases of lunacy, but over matrimonial causes. The Chancery powers, in cases of lunacy, have never been applied to this case, because, there existed in *England*, another and peculiar jurisdiction for the case ; but as such a jurisdiction does not exist here, the case seems to belong, incidentally, to the more general jurisdiction of this Court over those subjects. Whatever civil authority existed in the Ecclesiastical Courts, touching this point, exists in this Court, or it exists no where, and all *direct* judicial power over the case is extinguished ; but that is hardly to be presumed. For the more full examination of this very interesting point of jurisdiction, let us suppose the abominable case of a marriage between parent and child, or other persons in the lineal or ascending and descending line, is there no Court that can listen to the voice of nature and reason, and sustain a suit *instituted purposely* to declare such a marriage void? If a man marry his mother, or his sister, they are husband and wife, say the old cases, until a divorce, and the marriage be judicially dissolved. (39 *Edw.* III. 31. b.

9 *Hen.* VI. 34. 18 *Hen.* VI. 32. *Bro.* tit. *Bastardy*, pl. 23. 1 *Roll. Abr.* 340. A. 1. 4. 357. A. 3.) Are the principles of natural law, and of christian duty, to be left heedless†and inoperative, because we have no Ecclesiastical Courts recognised by law, as specially charged with the cognisance of such matters? All matrimonial, and other causes of ecclesiastical cognisance, belonged originally to the temporal Courts; (*vide* the case of *Legitimation and Bastardy*, Sir *J. Davies' Rep.* 140. and his argument in the case of *Præmunire, ib.* 273.) and when the Spiritual Courts cease, the cognisance of such causes would seem, as of course, to revert back to the *lay* tribunals. I apprehend, then, that the power is necessarily cast upon this Court, which has, by statute, the sole jurisdiction over the marriage contract in certain specified cases. The Legislature has, in that respect, pointed to this Court as the proper organ of such a jurisdiction.

We are placed in a singular situation, in this state, and, probably, one unexampled in the christian world, since we have no statute regulating marriage, or prescribing the solemnities of it, or defining the forbidden degrees. It remains to be settled, not only where the jurisdiction, in some of these cases, resides, but what are the sound and binding principles of common law, under which that jurisdiction is to be exercised.

It was said by *Vaughan*, Ch. J., in *Harrison* v. *Buswell*, (*Vaug.* 206. 2 *Vent.* 9. S. C.) in delivering the opinion, which he declared to be given upon consultation with all the judges of *England*, that by the ancient common law, some marriages were within forbidden degrees, and unlawful, and that the cognisance of such questions belonged to the Spiritual Courts. But he observed, that if it were not for the statutes of *Hen.* VIII., (and which we have not re-enacted,) it would be difficult to prove, that they were civilly bound by the *Levitical* degrees, in respect to the lawfulness of marriage connections, unless the prohibition was,

† unheeded

also, clearly dictated by the natural law. He held, that marriages, in the ascending and descending line, as between parents and children, were monstrous connections, and repugnant to the law of nature, and that, so far, the *Levitical* was a moral, as contradistinguished from a positive, prohition to the Jews, and binding upon all mankind.

Divorces *a vinculo*, says Lord *Coke*, (1 *Inst.* 235. a.) are *causa metus, causa impotentiæ, causa affinitatis, causa consanguinitatis,* &c. &c. (*Vide* also the case of the Earl of *Essex*, divorced in the Court of Delegates, and *Bury's* case, 1 *St. Tr.* 315. 10 *St. Tr. App.* 23. *Harg.* edit.) These cases, and that of lunacy, are not within the statute, giving to this Court jurisdiction concerning divorces, for the statute, in respect to divorces a *vinculo matrimonii*, only applies to adultery. All the causes for divorce specified in our statute, are those which arise *subsequent* to the marriage, and suppose it to have been lawful in the beginning. But I presume every one will readily admit, that there are other causes which render the marriage unlawful, *ab initio*, such as lunacy, idiocy, duress, consanguinity, &c.; and the question is, whether we have not a Court which is competent, not merely collaterally, but by a suit instituted *directly*, and for the sole purpose, to pronounce a divorce, in such cases. The principles of canonical jurisprudence, and the rules of the common law, are the same, in respect to some of those strong instances which I have mentioned, and there must be a tribunal to apply them. If it were otherwise, there would be a most deplorable and distressing imperfection in the administration of justice.

Besides the case of lunacy, now before me, I have, hypothetically, mentioned the case of a marriage between persons in the direct lineal line of consanguinity, as clearly unlawful by the law of the land, independent of any church canon, or of any statute prohibition. That such a marriage is criminal and void by the Law of Nature, is a point universally conceded. And, by the Law of Nature, I under-

stand those fit and just rules of conduct which the Creator has prescribed to Man, as a dependent and social being; and which are to be ascertained from the deductions of right reason, though they may be more precisely known, and more explicitly declared by Divine Revelation.   There is one other case, in which the marriage would be equally void, *causa consanguinitatis*, and that is the case of brother and sister; and, since it naturally arises, in the consideration of this subject, I will venture to add a few incidental observations.   I am aware, that when we leave the lineal line, and come to the relation by blood or affinity in the collateral line, it is not so easy to ascertain the exact point at which the Natural Law has ceased to discountenance the union.   Though there may be some difference in the theories of different writers on the Law of Nature, in regard to this subject, yet the general current of authority, and the practice of civilized nations, and certainly, of the whole christian world, have condemned the connection in the second case which has been supposed, as grossly indecent, immoral, and incestuous, and inimical to the purity and happiness of families, and as forbidden by the Law of Nature. (*Grotius de Jure*, &c. lib. 2. c. 5. s. 13.  *Puffend. de Jure Gent.* lib. 6. c. 1. s. 34.   *Id. de off. Hom.* lib. 2. c. 2. s. 8.   *Heinec. Op.* tom. 8. pars 2. p. 203.   *Taylor's Elem. Civ. Law*, 326.  *Montesq. Esp. des Loix.* liv. 26. c. 14.   *Payley's Moral Philosophy*, b. 3. part 3. c. 5.) We, accordingly, find such connections expressly prohibited in different Codes. (*Dig.* lib. 23. tit. 2. 18. lib. 23. tit. 2. l. 14. s. 2. lib. 45. tit. 1. l. 35. s. 1.   *Just. Inst.* lib. 1. tit. 10.   *De Nuptiis.  Vinnius*, h. t.  *Heinecc.* ubi supra. *Code Civile de France*, n. 161, 162, 163, 164.   *Inst. of Menu*, by Sir *William Jones*, c. 3. s. 5.   *Staunton's Ta-Tsing-Leu-Lee*, s. 107, 108.   *Sale's Koran*, c. 4.   *Marsden's Sumatra*, p. 194. 221.)  And whatever may have been the practice of some ancient nations, originating, as *Montesquieu* observes, in the madness of superstition, the

objection to such marriages, is, undoubtedly, founded in reason and nature. It grows out of the institution of families, and the rights and duties, habits and affections, flowing from that relation, and which may justly be considered as part of the Law of our Nature, as *rational* and *social* beings. Marriages among such near relations, would not only lead to domestic licentiousness, but by blending in one object, duties and feelings incompatible with each other, would perplex and confound the duties, habits, and affections proceeding from the family state, impair the perception and corrupt the purity of moral taste, and do violence to the moral sentiments of mankind. Indeed, we might infer the sense of mankind, and the dictates of reason and nature, from the language of horror and detestation in which such incestuous connexions have been reprobated and condemned in all ages. (*Plato de Leg.* lib. 8. *Cic. Orat. pro Mil.* 27. *Hermion. in Eurip. Androm.* v. 175. *Byblis. Ovid. Met.* lib. 9. *Tacit. Ann.* lib. 12. c. 4. *Vell. Paterc. Hist.* lib. 2. ch. 45. *Corn. Nep. Excel. Imp. Prefat.*) The general usage of mankind is sufficient to settle the question, if it were possible to have any doubt on the subject; and it must have proceeded from some strong uniform and natural principle. Prohibitions of the Natural Law are of absolute, uniform, and universal obligation. They become rules of the Common Law, which is founded in the common reason and acknowledged duty of mankind, sanctioned by immemorial usage, and, as such, are clearly binding. To this extent, then, I apprehend it to be within the power and within the duty of this Court, to enforce the prohibition. Such marriages should be declared void, as *contra bonos mores.* But as to the other collateral degrees, beyond brother and sister, I should incline to the intimation of the judges in *Harrison* v. *Buswell,* already cited, that as we have no statute on the subject, and no train of common law decisions, independent of any statute authority, the *Levitical* degrees are not binding, as a rule of municipal obedience.

Marriages out of the lineal line, and in the collateral line, be-
yond the degree of brothers and sisters, could not well be
declared void, as against the first principles of society. The
laws or usages of all the nations to whom I have referred,
do, indeed, extend the prohibition to remoter degrees, but
this is stepping out of the family circle; and I cannot put
the prohibition on any other ground than positive institution.
There is a great diversity of usage on this subject. *Neque
teneo, neque dicta refello.* The limitation must be left, until
the legislature thinks proper to make some provision in the
case, to the injunctions of religion, and to the control of
manners and opinion.

I have been led further than I, at first, intended, by these re-
marks, which have been made merely by way of argument,
and in illustration of the question touching the power and
duty of the Court to declare void the marriage of the lunatic
in the case before me. I trust I have shown that there must
exist such a power for this and other cases; and I, also,
trust that this Court will never be under the painful necessi-
ty of making a more solemn and direct application of the
doctrine.

I shall, accordingly, declare the marriage null and void,
and that the parties are free from the obligations of mar-
riage with each other.