ELIZABETH BURTIS,

v.

JOHN BURTIS.

The law of England concerning divorces, is chiefly, the ecclesiastical law, and not the common law of that country; and it has never been adopted, in this state.

Our statutes concerning divorces, are original regulations; and they do not adopt or introduce the English law of divorces.

We have no judicature authorized to adjudge by a substantive and effectual sentence, that a marriage is illegal, and to separate the parties.

This court can not dissolve a marriage or decree a divorce, for the cause of corporal impotence.

THIS bill was filed by a wife against her husband. It stated the marriage of the parties; that after the marriage, the complainant found, that the defendant was totally impotent; and that he had been so, from his birth. After stating a clear case of corporal impotence, on the part of the husband, with details, which are here omitted, the bill prayed a discovery from the defendant, in answer to the allegations of the complainant, and that the marriage might be dissolved.

The defendant demurred to the bill, objecting, that the complainant is not entitled to any relief; that the defendant ought not to be compelled to make any discovery; and that the complainant as the wife of the defendant, can not sue, otherwise than by her next friend.

The cause was now elaborately argued by counsel. We here give a very condensed statement of the discussion, with the authorities cited.

MR. BUEL for the defendant.

The complainant is not here authorized to sue, by any statute: and excepting the cases in which a wife is authorized by statute, to sue in her own name, she can sue only, by her next friend. Cooper's Equity Pleading 163.

The defendant is by the rules of equity, protected from the discovery sought by this bill. The discovery here demanded, would necessarily, lead to a violation of all decency and good morals. Cooper 196. Opinion of Lord Mansfield, in the case of Da Costa against Jones, Cowp. 729. No man is compelled to criminate himself, to subject himself to shame, or to expose himself to any forfeiture. Cooper 202. 1 Madd.

*1825.
20th September.*

*Marriage.
Divorce.*

71.

173. 14 Ves. 65. 4 Black. Comm. 65. 3 Ves. 368. 3 Merivale 693.

This bill alleges, that the complainant brought property to the defendant: and hence, a forfeiture of rights of property, is involved in this suit. The defendant can not be compelled to expose himself to such a forfeiture. Cooper 206. 207. 3 P. Wms. 236. 2 Vez. 265, Cooper 203. 1 Atk. 529.

The canon law of England is not in force here; and we have no statute regulating marriage. This contract here depends wholly, on the common law. 4 John. 52.

The canonical disabilities which invalidate a marriage in England, may be seen in 1 Black. Comm. 434. Co. Lit. 235. a. Reese's Cyclopedia, article Divorce. These disabilities there render the marriage not void, but voidable only; and the marriage remains in force, until a sentence of separation. The spiritual courts alone have jurisdiction to pronounce such a sentence; and those courts act only for the good of souls and the spiritual reformation of the parties.

By the laws of Justinian, personal imbecility was a cause of divorce; but only where it had continued two years; ab initio matrimonii usque ad duos annos continuos computandos: and this term was afterwards extended to three years. Code, book 5. title 17. section 10. The impotence in question in this case, has existed but a short time since the marriage, and for a time by no means sufficient to become a cause of divorce, according to the Roman law.

The regulations of foreign codes, on this subject, are well collected in 1 Beck's Medical Jurisprudence 43.

Impotence is then merely a canonical cause of divorce. It is one among many other causes of divorce, first introduced into England by the catholic clergy, in the twelfth century: and it is not a cause of divorce, by the common law. These canonical causes of divorce are not law here. Even in England, the jurisdiction of the ecclesiastical courts, was an encroachment upon the ancient laws of that realm. 5 Cokes Rep. Introduction. But no part of this ecclesiastical system of jurisprudence, was ever transferred to this country. 1 Black. Comm. 107.

Our constitution adopts such parts of the common law, as had been in force, in the colony of New-York. No ecclesiastical jurisdiction ever existed, in the colony; and no canonical cause of divorce, was known in the colonial laws or practice.

This court has no jurisdiction relative to divorces, excepting that given by our own statutes. It can not grant divorces, for canonical disabilities. The English chancery never claimed or exercised any such jurisdiction. 1 Ves. & B. 140. 1 Fonblanque 97. note n. 2 Ves. 191. 11 Ves. 526.

The decision of the late chancellor, in the case of Wightman v. Wightman, 4 John. ch. 343, if it can be maintained, is correct, only on the ground, that want of reason is a disability by the common law; or perhaps, on the ground of the superintending power of this court over lunatics. The idea of the late chancellor, that the power over matrimonial causes, is necessarily cast upon this court, is certainly, incorrect. If this were so, our statutes would be useless. When the legislature have given to this court, power over marriage in certain specified cases, the just construction of their provisions, is, not that this court has power over marriages in all cases, but that it has power over this contract, in the cases specified, and in no other case. The sound conclusion from our statutes, must be, that they alone give to this court its authority to divorce.

This lady complains that she has been defrauded by her marriage with an impotent man; and the idea of fraud is urged, as a ground upon which the complainant may obtain a divorce from this court. This is the first time, that the term fraud has been applied to a disaster of this nature. If a marriage rendered unhappy by a natural infirmity, can be considered a fraud, the matrimonial state may present unnumbered frauds arising from unrequited affection, disappointed expectations, and the troubles of wedlock: and the complaints of husbands and wives against each other, under the name of frauds, would form a most ample field for the exercise of equitable jurisdiction. The English chancery never divorced for fraud. The frauds against which courts of equity give relief, are those which concern property and affect rights of property. 1 Day's cases in error, 111.

The charge now in question, is not susceptible of proof, by the ordinary methods of investigating truth.　Reese's Cyclopedia, title Impotence.　Bury's case 5 Co. Rep. 98. Case of the Earl of Essex in the state trials.　Objections of the council of revision, to the bill in the case of Eunice Chapman, in the journal of the assembly of 1818, page 457. How is the question of fact to be tried ?　Are both parties to be tried ?　Is an issue to be directed; and is a public trial to take place ?

This court ought not to assume a jurisdiction so new and so extensive, upon any theoretical reasoning, or upon any doubtful construction of its own powers.

Mr. WENDELL and Mr. VIELE for the complainant.

A married woman may exhibit a bill or defend a suit in her own name, if from the whole bill it is apparent, that she is entitled to act as a single woman.　Cooper 23, 30.　Redesd. ch. pl. 24.　2 Vern. 104.　3 P. Wms. 37.　1 Salk 116.

This is a bill for relief.　If that part of it which seeks a discovery is impertinent, the defendant should have applied to a master, to have that part expunged.　The cases cited by the defendant's counsel, in which it was held, that the party was not bound to make a discovery, were principally, bills filed for discovery merely, and not bills for relief.　A defendant is bound to answer a bill for relief, though his answer may expose him to shame, or subject him to loss.　If this is a proper bill for relief, the discovery is incidental to the relief sought, and the defendant must answer.　This point will therefore, depend upon the determination of the main question in the cause.

In support of the bill, generally.　The jurisdiction of the ecclesiastical courts of England in granting divorces and annulling marriages, has devolved upon and appertains to the court of chancery of this state.　The counsel took a general view of the nature and extent of the jurisdiction of the ecclesiastical courts, and insisted, that those courts formed a part of the system of jurisprudence of the common law.　3 Bl. Comm. 61. 101. 95.　2 Burn's Eccl. Law. 446.　The ecclesiastical or canon law is a supplemental part of the common law.　4 Johns. ch. 196.　As such it is the law of this

land, except in those cases where the proceedings are had in the ecclesiastical courts, solely pro salute animarum, and excepting those cases in which the separation of church and state and our own political institutions have abrogated this part of the English law. There being no ecclesiastical court in this state, this law must necessarily be administered by some tribunal established among us; and the only question is, what court here, has the jurisdiction. None of our courts is so fit to assume jurisdiction in these cases, as the court of chancery. In England, during the usurpation of Cromwell, when there was no spiritual court, the court of chancery exercised the powers of the ecclesiastical courts. 1 Madd. ch. 306. note g. 2 Shower's Rep. 283. Our legislature by authorizing bills for divorce, to be filed in chancery, in certain specified cases, have designated this court as the proper tribunal to take cognizance of matrimonial causes. Besides, all such causes originally belonged to the temporal courts. Davis' Reports 140. 273: and when the spiritual courts cease to have cognizance of them, they properly go back to the lay courts. In the case of Wightman v. Wightman 4 Johns. ch. 343. which was a bill for a divorce on the ground of the lunacy of the complainant, at the time of the marriage, Chancellor Kent discussed at length, the question of jurisdiction of this court, in cases of divorce not authorized by statute. His conclusion was, that jurisdiction in all matrimonial causes, belongs to this court; and that whatever civil authority existed in the ecclesiastical courts of England, touching the granting of a divorce in a case of lunacy, exists now in the court of chancery of this state. If the court of chancery rightfully held cognizance of that case, it has jurisdiction of this matter.

The ecclesiastical courts of England grant a divorce causa impotentiæ. 1 Bl. Comm. 440. Co. Lit. 235 a. 1 Anderson's Rep. 185. 5 Co. 98. b. The case of Morris and Webber, 2 Leon. 169. Dy. 179. a. The case of the Earl of Essex divorced in the court of delegates, and Bury's case, 1 St. Tr. 315. 10 St. Tr. App. 23. Harg. edit. The marriage of a person subject to this charge, is not void; but on the contrary, until sentence of nullity is pronounced, it is va-

1825.

BURTIS
v.
BURTIS.

lid, to all civil purposes. Nothing less than death or the judicial decree of some competent court can dissolve the marriage. 2 Burn's Eccl. Law. 446. 1 Johns. ch. 393. If a tribunal does not exist among us competent to administer relief in such a case, there would be a wrong without a remedy, a most distressing imperfection in the administration of justice.

If the jurisdiction of the ecclesiastical courts in matrimonial causes, has not devolved upon this court, it has cognizance of this matter, under its concurrent jurisdiction with the courts of law, as a case of fraud, or under its exclusive jurisdiction, as a court of equity. The law considers marriage in no other light than as a civil contract. To give effect to this contract, it is necessary that the parties should be able to contract, willing to contract, and should actually contract. 1 Bl. Comm. 433. Impotency disqualifies a person from contracting matrimony. In such a case, the law considers the contract as made in fraudem legis, and decrees a separation, not only a mensa et thoro, but a vinculo matrimonii. 3 Bl. Comm. 94. On the ground of the want of voluntary consent, the present chancellor recently annulled a marriage, in the case of Ferlat v. Gojon.

The exclusive or peculiar jurisdiction of the court of chancery is very extensive, and embraces every possible case not provided for by express law. Fonblanque says, "a court of " equity claims an exclusive jurisdiction, whenever upon the " principles of universal justice, the interference of a court of " judicature is necessary to prevent a wrong, and the posi- " tive law is silent." Fonbl. Eq. 11.

If the court of chancery has not the power of granting a divorce, except in the cases specified in the statutes, it has the power judicially to declare, that there never was a marriage, on the ground that the defendant was disqualified from contracting matrimony. " Sentences of the ecclesiastical courts " which release the parties a vinculo matrimonii, by reason " of impuberty, frigidity, consanguinity within the prohibited " degrees, prior marriage, or the want of the requisite con- " sent of parents or guardians, are not dissolutions of the mar- " riage contract, but judicial declarations that there never

"was any marriage; such impediment subsisting at the time, "as rendered the celebration of the marriage rite a mere "nullity." Paley's Moral Philosophy, Book 3. part 3, ch. 7.

If this jurisdiction belongs to the court of chancery, the mode of trial in these cases, will necessarily conform to the established practice of this court, in ordinary cases. If from the proofs exhibited, the chancellor can not arrive at a satisfactory conclusion, a feigned issue will be awarded; and the case will be tried by a jury of men, without the aid of a jury of matrons. 1 Beck's Medical Jurisprudence ch. 3. note 1. Nor will it be necessary to resort to the ordeal of a congress, as formerly practised in France. Bayle's Dictionary vol. 4. p. 799 to 807. If the complainant can not establish the allegations of her bill by the ordinary modes of proof, it will be her misfortune. Those allegations are as susceptible of a satisfactory investigation for the ascertainment of truth, as other facts; since impotency may be tested by certain known laws of nature. 1 Beck's Med. Juris. ch. 3. The possibility of error is admitted; but the argument drawn from that consideration, strikes at the root of all human tribunals, and would prevent the investigation of every case of doubt and uncertainty.

The indecency of the investigation is no objection to this suit. As well might it be said, that actions for seduction and criminal conversation should be abolished; that there should be no divorce for adultery, and no trial for rape; and that all questions concerning sexual intercourse, should be forever excluded from courts of justice.

THE CHANCELLOR. When New York became a province of England, it was for some years, ruled by a governor, or a governor and council; and during that period, the governor either alone, or in conjunction with the council, seems to have exercised all magistracy, executive, legislative and judicial. During that period, one of the governors, Lovelace, granted four divorces; of which, one was in 1670, and the other three in 1672. These are the only instances of divorce, which appear to have taken place in the colony, during the long period, in which New York was a province of

England. , In 1683, the people were admitted to a partici-
pation of the legislative power; and from that time, laws
were enacted by the colonial legislature. The colony never
had any court possessing jurisdiction of matrimonial causes,
or power to grant divorces. No statute defining causes of
divorce, or authorizing divorce, in any case whatever, was
ever enacted by the legislature of the colony. Some special
applications for divorces, were made to the colonial legisla-
ture ; but all such applications were refused. The govern-
or of the colony, with the consent of the council, had power
to establish courts of justice ; and all the courts of the colo-
ny, derived their origin from this source of authority. But
no court having cognizance of matrimonial causes or divor-
ces, was ever established in the colony ; no court of the colo-
ny exercised any such jurisdiction; and no law concerning
divorce, was ever enacted by the colonial legislature. The
four divorces granted by Governor Lovelace, must be regard-
ed, as extraordinary acts of power, by a chief magistrate who
possessed very great and indefinite authority ; they were the
acts of one governor ; they stand alone, in the history and
practice of the English colony; and they afford no proof of
any law of the colony authorizing divorces. According to
all the information which I can obtain from records or other-
wise, it appears, that no divorce took place in the colony of
New York, during more than one hundred years, preceding
the time when the colony became a state ; and that the only
divorces which ever took place in the colony, were the four
granted by Governor Lovelace, in 1670, and 1672. Thus,
it appears, that the law of England concerning divorces and
matrimonial causes, was never adopted in the colony of New
York. It was not adopted in fact or in practice ; and it was
never the law of the colony.

By the constitution of the state, adopted in 1777, such
parts of the common law of England, and of the statute law
of England and Great Britain, and of the acts of the legis-
lature of the colony, as together formed the law of the colo-
ny, on the nineteenth day of April 1775, were declared to be
the law of this state. The law of the colony, was thus adop-
ted, as the law of the state. The law of England concerning

divorces and matrimonial causes, not forming a part of the law of the colony, did not become the law of the state.

During more than ten years after the colony became a state, there was no law authorizing a divorce, in any case whatever. On the thirtieth day of March 1787, the legislature passed a statute, entitled an "act directing a mode of "trial, and allowing of divorces in cases of adultery." The preamble of this law was expressed in the following terms. "Whereas the laws at present in being within this state, re- "specting adultery, are very defective, and applications have, "in consequence, been made to the legislature, praying their "interposition: and whereas it is thought more advisable for "the legislature to make some general provision in such ca- "ses, than to afford relief to individuals, upon their partial "representations, without a just and constitutional trial of the "facts." This was the first law in this state, authorizing a divorce; and it was confined to the case of adultery. It continued to be the only law, until the ninth day of April 1813, when the legislature made a new and extensive provision for divorces. By the statute then enacted, the wife may obtain a divorce from her husband, where he has been guilty of cruel and inhuman treatment towards her, or such conduct as renders it unsafe and improper that she should cohabit with him; or where he has abandoned her and neglects to provide for her. The provisions last mentioned, were by a statute of the tenth day of April 1824, extended to husbands against their wives.

Such is the history of our own law concerning divorces: and its actual state is found in these statutes now in force. I can not admit, that we have another code, on the same subject; and that the laws of England concerning divorces, are also, laws of this state. The English law concerning divorces and causes of divorce, as it exists now, and as it existed while this state was a colony, is chiefly, the ecclesiastical law, and not the common law of that country. It is administered by judges and courts, whose jurisdiction has never existed, either in the state or the colony of New York; and it was evidently, regarded by our ancestors of the colony

72

and the state, as no part of the common law, which they adopted.

Our statutes are clearly, original regulations, intended to authorize divorces in cases, in which no divorce could before be obtained. They define the causes for which divorces shall be granted; they give jurisdiction of those cases to this court; and they give no other jurisdiction. The specified cases are with some differences, causes of divorce by the laws of England; but these statutes are evidently, founded on the supposition, that the causes of divorce which they define, were not causes of divorce, by any preexisting law in force in this state. To consider these statutes as an adoption of the English law of divorces, would be a violent perversion of the language and intention of the legislature. Such a construction of these laws, would in effect, declare, that statutes authorizing divorces, in certain cases particularly specified, also authorize divorces, in a multitude of other cases not specified. Had the legislature considered the English law of divorces, as the law of this state, they would probably, have authorized some tribunal to administer that law; but they have conferred no such authority; and they have cautiously, limited and regulated the power of divorce, as an innovation upon the preexisting law of the state. If the power to divorce for one cause, could imply a power to divorce for a different cause, the statute of 1787, authorizing divorces, for adultery, might have authorized divorces for cruel treatment or desertion; and the subsequent statutes, would have been unnecessary. But the legislature entertaining no such opinion, have advanced by successive steps, and have authorized divorces, not by adopting or recognizing any foreign law, but by their own acts of legislation. The causes of divorce and the jurisdiction of this court, are equally prescribed by these statutes; the jurisdiction is given in the defined cases; and these laws confer no jurisdiction or authority to divorce, in any other case. In every view of these acts of our legislature, they are substantive laws, authorizing divorces in the cases which they specify, and not authorizing divorce, in any other case, or for any other cause.

It would be useless here, to inquire, whether these laws

1825.

Burtis.
v.
Burtis

have provided adequately and wisely, for all the cases in which divorces should be allowed. According to the opinion of some, the great interests of society are best consulted by treating marriage as an indissoluble contract, in all cases whatever; and this opinion seems to have prevailed in the colony of New York, and in the early age of the state. To others, this rule of policy, has appeared far too severe ; and they have held, that the welfare of society is best promoted, by separating the parties, when their happiness is destroyed, and the legitimate ends of matrimony wholly fail. The regulations of civilized societies, concerning divorces, differ widely, according to different views of expediency; and in every state, it is the province of the lawgiver, to establish positive rules, on this subject. Our own legislature have decided for ourselves; their views of expediency concerning divorces, are found in the laws which they have enacted ; and when the legislature shall deem it expedient to authorize divorces for causes not embraced by the existing laws, they will enact new provisions.

The divorces thus allowed and regulated by statute, are for causes occurring after marriage ; and we have no statute regulating marriage itself. This important contract still depends on the principles of the common law. Those principles are applied by all our courts, in the cases and proceedings which belong to their respective jurisdictions, when it is necessary to determine that a marriage is valid or void ; but we have no judicature authorized to determine by substantive and effectual sentence, that marriages are legal or illegal, and to separate persons who are illegally married. The want of a judicature possessing such an authority, is an imperfection ; but every court of this state, is confined to its allotted jurisdiction ; and it belongs to the legislature, to provide a remedy for this defect.

Two decrees annulling marriages, have been made by this court, in cases not comprehended by our statutes concerning divorces. In the case of Wightman v. Wightman, 4 Johns. ch. 343, one of the parties was a lunatic ; and in the recent case of Ferlat v. Gojon, the marriage had been procured by an atrocious fraud. These marriages were clearly void :

and this court pronounced the sentence of nullity. If these two decrees are denominated divorces, they did not arrogate to this court any general power of divorce, in cases not prescribed by our statutes. The power of this court to vacate contracts obtained by fraud, is an unquestioned branch of its jurisdiction; a gross fraud in obtaining a marriage, seemed to fall within this jurisdiction; and the court adjudged such a marriage void. But the cases in which this court, can annul marriages, in virtue of its powers as a court of equity, must be few and very peculiar; and they must appertain to the jurisdiction of equity.

The cause for which this court is now asked to dissolve a marriage, is corporal impotence, on the part of the husband. This fact is not a cause of divorce, by our statutes; and it is impossible to yield to this suit, without adopting the law of England or of some other country, concerning divorces, as the law of this state. If a divorce can be granted for this cause, the whole catalogue of causes allowed by the laws of England, may be equally adopted; the acts of the legislature and the policy of the state, respecting divorces, would be superseded by the doctrines of a foreign code; and a power hitherto unknown in this state, would be exercised. The corporal impotence of the husband, is a cause of divorce in England, and by the laws of most countries; but it is not a cause of divorce, by the laws of this state. This suit must therefore, be dismissed.

The suit was accordingly, dismissed; but without costs.