GRACE McDONALD WHITNEY, Plaintiff, *v.* EARL R. WHITNEY, Defendant.

Supreme Court, Jefferson Special Term, September, 1923.

**Husband and wife — annulment of marriage — person of sound mind may maintain an action to annul marriage with person insane at the time of the marriage.**

Independent of any statutory provision, the Supreme Court on its equity side has jurisdiction to declare void a marriage contract where one of the parties to the contract was a lunatic at the time of the marriage.

The person of sound mind may, therefore, maintain an action to annul the marriage on the ground that the defendant was insane as the time of their marriage, and upon proof that there has been no cohabitation between them since the discovery of the lunacy, which is incurable, the plaintiff will be granted a decree declaring the marriage void and annulling the same and that the issue born of the marriage are the legitimate children of the parties thereto and plaintiff will be awarded their custody.

ACTION to annul the marriage of plaintiff to defendant on the ground that the defendant was insane at the time the marriage was contracted.

*Melvin F. Kinkley,* for plaintiff.

*Phileman R. Whitney,* guardian *ad litem* in person.

SMITH, J. This action was commenced by the service pursuant to an order of this court of the summons and complaint, upon the defendant personally, Charles M. Burdick, superintendent of the Dannemora State Hospital at Dannemora, N. Y., the attorney-general of the state of New York and upon Phileman R. Whitney, father and next friend of said defendant. By order of this court said Phileman R. Whitney was appointed guardian *ad litem* of said defendant and appeared in person at the trial.

The complaint asks for the annulment of the marriage of the plaintiff and defendant upon two grounds:

1. That the defendant was insane at the time of the marriage and that the marriage was, therefore, void, and

2. That the marriage was brought about by a fraud perpetrated by the defendant upon plaintiff in that he concealed the fact of his lunacy.

On the 31st day of August, 1904, the plaintiff, at that time fifteen, and the defendant, nineteen years of age, were married at Gouverneur, N. Y.; they lived together as man and wife until July, 1910; there were born of this marriage four children, two of whom are dead and two living. The marriage was contracted

without the knowledge or consent of the parents of either of the parties; so long as they lived together they lived with the parents of the defendant.

While the plaintiff was about to become a mother for the fourth time and in the month of July, 1910, the defendant committed the crime of abduction, was indicted, tried, convicted and in December, 1910, sentenced to the New York State Reformatory at Elmira, N. Y. Within a few months after his confinement there, he was committed to the Dannemora State Hospital at Dannemora, N. Y., for the reason that he was insane and suffering from a mental disorder known as *dementia præcox;* about the time of the expiration of the original term of his sentence and in December, 1920, he was again examined by the physicians of said hospital and again committed by the order of the county judge of Clinton county on the ground that he was still suffering from said mental disorder.

The defendant is incurably insane; was insane at the time of the marriage. The insanity was not known to the plaintiff at the time of the marriage and was not known to her until the time of the committal to Dannemora in April, 1911. She did not know that he was incurably insane or that the insanity antedated the marriage until the time of the commencement of this action. She noticed he was queer but his mother told her, " Now, don't mind him, he was nervous from childhood. We would never cross him in any way." Plaintiff at the time was inexperienced; the defendant was the only beau she ever had; she was not yet of age at the time of the abduction; she has not cohabited with the defendant since then. It is unnecessary here to go into the distressing details of the situation created by this unfortunate marriage. Sufficient it is to say, that the essential facts in the case are established by abundant and convincing evidence.

It is true that the plaintiff might have sought divorce after the abduction but she gave little thought to the matter; her father and mother-in-law were very kind and considerate to her and to her children; they cared for and supported them all. After the abduction, the plaintiff went to work to earn money for the support of her children; her devotion has been to them. Not until she discovered the progressive and incurable character of the mental condition of the defendant, that the lunacy existed at the time of the marriage, though the manifestations were not so evident then as they became later, did she seek the relief herein demanded. One of the doctors testified that as family physician he had attended the defendant from early childhood; that he then thought that defendant's nervous condition was due to sexual excesses but is now satisfied that the latter were due to the impairment of will

power by his mental disease; another testified that he attended the boy shortly after the marriage and was satisfied then that he was suffering from *dementia præcox.* There has been no laches on the part of the plaintiff nor the operation of any statute of limitations which bar the relief herein sought.

There is no evidence in the case which would justify a finding that the marriage was brought about by fraudulent misrepresentation or concealment. The plaintiff was urged into the marriage, but there was no actual misrepresentation. There is, of course, the legal presumption of sanity upon which every one has, and the plaintiff had, the right to rely, even though in fact she never thought upon the matter at all. Unless we are prepared to make a new definition of fraud as applied to cases where insanity is involved, there is here no basis for the annulment of the marriage on the ground of fraud. There can be no fraud without intent; instances are rare indeed where a lunatic could be charged with the fraud of concealment; such a fraud might be perpetrated by others entering into conspiracy to bring about a marriage between one insane and one of sound mind, which might be held to be a fraud, constituting a ground for annulment. A lunatic would scarcely recognize himself as such. It has been held that a person who is insane cannot be guilty of conduct that will constitute a ground of divorce. *Kirkpatrick* v. *Kirkpatrick,* 81 Neb. 627; 16 L. R. A. (N. S.) 1071.

I can conceive of nothing which in its essence amounts to a greater fraud upon a woman than the lunacy, unknown at the time of marriage, of him with whom she made a marriage contract. The effect on her is no less than it would be had an actual fraud been perpetrated. No innocent person of sound mind would marry a person known to him or her to be insane. Here are all the earmarks of fraud, excepting only intent; there is a virtual if not an actual fraud. Certainly no condition calling more strongly for equitable relief could hardly arise.

We are in this case confronted with two questions:

*First.* Has this court now the power to declare void a marriage contract where one of the parties thereto was a lunatic at the time it was entered into?

*Second.* Can the party of sound mind bring the action or is the right of action limited to those acting on behalf of the lunatic?

As to the first question: Were this question before me *de novo* I should feel and be of the opinion that it was of the very essence of equitable jurisdiction to declare void a marriage contracted by a person of sound mind with a person insane at the time of the marriage at the instance of either party and that the power is

inherent in a court of equity in the absence of any statutory pro-, vision; this power came over to our courts with the common law. If this were not so, one might well ask: " What is a court of equity for? " Of course, cases of this kind are very rare. Can it be possible that there is such a wrong without a remedy? I trust and think not. Irrespective of any question of fraud, of questions of sound public policy, of the inherent nature and sanctity of the marriage contract, the appeal for relief of the innocent individual in such a case as is here involved is so strong as to impel the belief that research would show that upon grounds elemental in equity jurisprudence there is inherent power to grant the prayer.

In view of the amendment of section 1743 of the Code of Civil Procedure (Laws of 1919, chap. 144) whereby the provision thereof authorizing an action for a judgment declaring a marriage contract void where one of the parties thereto was at that time a lunatic was eliminated and no other provision was made by statute upon the subject, I feel impelled to examine the statutory and judicial history of the subject in this state.

The first Revised Statutes (1829), part II, chapter 8, title 1, article 2, provided:

" § 20. The chancellor, may, by a sentence of nullity, declare void the marriage contract, for either of the following causes, existing at the time of the marriage.    *    *    *

" 3. That one of the parties was an idiot or lunatic.    *    *    *

" § 25. When a marriage is sought to be annulled, on the ground of the lunacy of one of the parties, it may be declared void at any time, during the continuance of the lunacy, or after the death of the lunatic in that state, during the lifetime of the other party to the marriage, on the application of any relation of the lunatic, interested to avoid the marriage."

Section 26 provided that if during the lifetime of both parties no relative brought the action, it might be brought on behalf of the lunatic by a next friend.

Section 27 provided that the lunatic after restoration to sound mind might bring the action.

Section 28 provided for the legitimacy of any children born of the marriage.

Section 29 defined a " lunatic " as being " every person of unsound mind, other than idiots."

Such were the applicable provisions of the first Revised Statutes.

The contract of marriage to which a " lunatic " was a party was under the statute a nullity to be declared such by a court of equity upon the establishment of the existence of the lunacy at the time of the marriage. It is obvious that a void contract is void. It

could scarcely be void as to one party and good as to the other. For obvious reasons growing out of the very nature of the marriage contract, the question of nullity could not be left to the determination of a party without suit; hence the provisions of the statutes. It would seem that under these provisions there could be no question as to the right of either party to bring the suit to have the nullity determined. Sections 25, 26 and 27 clearly applied to the time when and prescribed those by whom the action could be brought on behalf of the lunatic.

In *Wightman* v. *Wightman*, (1820) 4 Johns. Ch. 343, Chancellor Kent says: " It is too plain a proposition to be questioned that idiots and lunatics are incapable of entering into the matrimonial contract. * * * Though such marriages be *ipso facto* void, yet * * * it is proper that there should be a judicial decision to that effect by some court of competent jurisdiction."

Again, at page 346, the chancellor said: " The fitness and propriety of a judicial decision, pronouncing the nullity of such a marriage, is very apparent, and is equally conducive to good order and decorum, and to the peace and conscience of the party."

He then announced the doctrine that the Court of Chancery in this state had jurisdiction over all matrimonial cases. The following is his language: " There must be a tribunal existing with us competent to investigate such a charge, and to afford the requisite relief; and the power, I apprehend, must reside in this court, which has not only an exclusive jurisdiction over cases of lunacy, but over matrimonial causes. The chancery powers, in case of lunacy, have never been applied to this case, because there existed in England another and peculiar jurisdiction for the case; but as such a jurisdiction does not exist here, the case seems to belong, incidentally, to the more general jurisdiction of this court over those subjects. Whatever civil authority existed in the ecclesiastical courts touching this point exists in this court, or it exists nowhere, and all direct judicial power over the case is extinguished; but that is hardly to be presumed. For the more full examination of this very interesting point of jurisdiction, let us suppose the abominable case of a marriage between parent and child, or other persons in the lineal or ascending and descending line,— is there no court that can listen to the voice of nature and reason, and sustain a suit *instituted purposely* to declare such a marriage void? If a man marry his mother, or his sister, they are husband and wife, say the old cases, until a divorce, and the marriage be judicially dissolved. (39 Edw. III. 31 b; *9 Hen. VI. 34; 18 Hen. VI 32; Bro. tit. Bastardy, pl. 23; 1 Roll. Abr. 340, A. 1. 4; 357, A. 3.) Are the principles of natural law and of Christian duty to be left unheeded and inoper-

## 490 WHITNEY *v.* WHITNEY.

ative because we have no ecclesiastical courts recognized by law as specially charged with the cognizance of such matters? All matrimonial and other causes of ecclesiastical cognizance belonged originally to the temporal courts; (vide the case of Legitimation and Bastardy, Davies, Rep. 140, and his argument in the case of Praemunire, Id. 273); and when the spiritual courts cease, the cognizance of such causes would seem as of course to revert back to the lay tribunals. I apprehend, then, that the power is necessarily cast upon this court, which has, by statute, the sole jurisdiction over the marriage contract in certain specified cases. The legislature has, in that respect, pointed to this court as the proper organ of such a jurisdiction."

There was much controversy over this decision of the great chancellor and effort was made in subsequent decisions to limit its effect to the case in hand and to cases of fraud which all decisions admit were within the equity powers of the court under its general jurisdiction over questions involving fraudulent contracts. *Burtis* v. *Burtis*, (1825) 1 Hopk. Ch. 557; *Ferlat* v. *Gojon*, (1825) Id. 478.

In *Perry* v. *Perry*, 2 Paige, 501, Chancellor Walworth sought to hold that the jurisdiction of the court, in the absence of statutory authority, was limited to cases of marriages void *ab initio*, as distinguished from *de facto* or voidable marriages. He says: " That part of the ancient common law of England which rendered a marriage absolutely void   *   *   *   was undoubtedly brought to this country by our ancestors, and formed a part of the law of this colony   *   *   *. The Court of Chancery and courts of common law always exercised the power to declare the marriage absolutely void, whenever the question came before them in any collateral proceeding. [Citing cases.] In those cases the sentence of the ecclesiastical courts does not dissolve the marriage, inasmuch as no lawful marriage can have taken place. It merely declares the fact of marriage to be a nullity."

While limiting the jurisdiction of the court to cases where the marriage was void *ab initio*, he says: " The decision of Chancellor Sanford in *Burtis* vs. *Burtis* (*supra*) is therefore entirely consistent with that of his predecessor in *Wightman* vs. *Wightman* (*supra*),   *   *   * so far as relates to the point actually before the court in the last mentioned case. In the one case the marriage was absolutely void; and this court, in the exercise of its ordinary jurisdiction, had a right to remove the apparent obstruction to the wife's contracting matrimony with any other person."

So it would seem clear that independent of any statutory provision a court of equity has jurisdiction to declare void a marriage contract where one of the parties to the contract was a lunatic at

the time of the marriage. The difficulties were cleared up by the Revised Statutes above quoted which recognized that such a marriage was void and that its nullity might be declared by the chancellor.

The provisions of the first Revised Statutes above quoted were with a rearrangement incorporated in that part of the Code of Civil Procedure enacted in 1880, as sections 1743, 1747 and 1748. Section 1743 so far as applicable reads as follows: "An action may also be maintained to procure a judgment, declaring a marriage contract void and annulling the marriage for either of the following causes, existing at the time of the marriage. * * *

" 3. That one of the parties was an idiot or a lunatic."

Section 1747 so far as applicable reads as follows: "An action to annul a marriage, on the ground that one of the parties thereto was a lunatic, may be maintained, at any time during the continuance of the lunacy, or, after the death of the lunatic in that condition, and during the life of the other party to the marriage, by any relative of the lunatic, who has an interest to avoid the marriage."

Section 1743 of the Code of Civil Procedure was amended by chapter 144 of the Laws of 1919 to read as follows: "An action may be maintained to procure a judgment declaring the nullity of a void marriage or annulling a voidable marriage heretofore or hereafter entered into or contracted."

This provision became section 1132 of the Civil Practice Act while section 1747, *supra,* became section 1137 thereof.

So that as the statutes stand to-day there appears to be no express statutory authority for the maintenance of an action to annul a marriage on the ground of lunacy existing at the time of the marriage, unless it could be held to be found in a strained construction of section 1137 of the Civil Practice Act which reads the same as section 1747 of the Code of Civil Procedure and just as it did at the time section 1743 thereof gave expressed statutory authority to annul a marriage on the ground of the lunacy of either party existing at the time of the marriage, or in subdivision 3 of section 7 of the Domestic Relations Law, which provides that a marriage is void from the time it is so declared by a court of competent jurisdiction if either party

" 2. Is incapable of consenting to a marriage for want of understanding."

Want of understanding would always cover a case of idiocy but rarely a case of lunacy. Certainly there is no evidence in the instant case which would warrant a finding that the defendant at the time of the marriage was wanting in the required understanding.

Yet the Civil Practice Act clearly assumes that the power to

annul on the ground of lunacy resides in the court, because section 1135 provides at subdivision 2 thereof: " If a marriage be annulled on the ground of the idiocy or lunacy of one of the persons entering into the marriage, a child of the marriage is deemed the legitimate child of the parent of sound mind, and the court * * * may decide that a child of the marriage is the legitimate child of the parent of unsound mind."

Were it not for the statutory history of section 1137 of the Civil Practice Act, the fact that it clearly referred only to procedure when it existed alongside of section 1743 of the Code of Civil Procedure from 1880 to 1919, and were it not for its incompleteness for such purpose, I would not hesitate to hold that it constituted a statutory warrant for the maintenance of the action. At least the statutory provisions now remaining assume that this court has jurisdiction. It certainly had jurisdiction according to the decisions cited herein prior to the enactment of the declaratory statute on the subject and that jurisdiction now continues. Therefore, I hold that the Supreme Court of this state on its equity side has the power to declare void a marriage contract entered into between a person of sound mind and a lunatic where the lunacy existed at the time of the marriage.

As to the second question: " Can the party of sound mind bring the action or is the right limited to those acting on behalf of the lunatic? "

In *Reed* v. *Reed,* 106 Misc. Rep. 85, this question was answered in the negative. A demurrer was interposed on the ground that the complaint did not state facts sufficient to constitute a cause of action, and that the plaintiff was not the proper person to commence the action. The demurrer was sustained on account of the provision of section 7 of the Domestic Relations Law which, after enumerating the grounds for annulling a marriage, among which is not " lunacy," provides as follows: "Actions to annul a void or voidable marriage may be brought only as provided in the code of civil procedure."

The court held that this provision referred in cases of lunacy to section 1747 of the Code of Civil Procedure, and that said section only gave the right to one acting on the part of the lunatic. The order sustaining the demurrer was affirmed in *Reed* v. *Reed,* 195 App. Div. 531, by a divided court. Justices Kiley and Woodward concurred in the result but excepted to the ground taken in the prevailing opinion that the sane party to a marriage may not bring suit to void it on the ground of insanity.

There was never any provision in the Domestic Relations Law that an action to annul a marriage contract could be maintained

on the ground of lunacy. In section 6 thereof void marriages, and in section 7, voidable marriages, are defined. The provision of this section quoted as to the manner of bringing an action to annul marriages is predicated upon the definition of void and voidable marriages therein contained. It could scarcely refer to cases where lunacy was involved and has a broader significance than given to it in *Reed* v. *Reed, supra.* It refers to the manner of bringing the action, not to parties who may bring the action; it refers to such provisions as section 1774 of the former Code.

I cannot agree to such an astounding proposition as is here involved, that an innocent party marrying a lunatic is without remedy, unless he or she can sustain the allegation of fraud. Nor do I believe that the legislature in enacting the provisions of the Domestic Relations Law had any such intent. I concur in the reasoning of Mr. Justice Greenbaum in *Liske* v. *Liske*, 135 N. Y. Supp. 176. While there appears to be no decision in the Court of Appeals where the questions here involved were considered, yet in the case of *Jones* v. *Brinsmade*, 183 N. Y. 258, the wife, the party of sound mind, brought the action to annul her marriage with the defendant on the ground that the defendant was insane at the time of the marriage. No question was raised as to the right to maintain the action, but an appeal was taken from an order awarding costs and alimony; while this case may not be taken as an authority on the main question, it is quite significant that no one questioned the right in the plaintiff to maintain the action, which right was assumed to exist as a matter of course, as I do now hold that it exists.

There can be no reason assigned why the person of sound mind should not maintain the action excepting that he or she had knowledge of the insanity at the time of the marriage. The rule is unthinkable that the person who is deceived in effect, who is placed in this terrible position without fault, should be without relief. The provisions of section 1135 as to legitimacy whereby any children are deemed the children of the party of sound mind would seem to assume that such party could maintain the action to annul.

Sections 1137 and 1138 of the Civil Practice Act clearly were designed to define the persons who could bring the action on behalf of the lunatic; manifestly a lunatic could not bring the action himself and so the sections provide who shall act in his or her behalf under different circumstances. The legislature never intended such an absurdity as that an action to annul a marriage in its very essence void could be maintained by one party to it and not by the other; that, as in this instant case, the main sufferer could not get relief. It simply here provided that inasmuch as a lunatic

had no standing in court, certain persons in his behalf might maintain the action.

I, therefore, hold that the person of sound mind united in marriage to a person who is a lunatic at the time of the marriage, where the lunacy was unknown to the person of sound mind at the time of the marriage, may maintain an action to annul the marriage.

The facts of the case are that the lunacy of the defendant existed and was unknown to the plaintiff at the time of the marriage; that there has been no cohabitation between the parties since the lunacy was discovered, and that the lunacy is not temporary but is incurable.

The plaintiff herein is entitled to a decree declaring her contract of marriage with the defendant void, and annulling the same, and that the children of the marriage are the legitimate children of the plaintiff and the defendant Earl R. Whitney, and the plaintiff be awarded the custody of such children.

Decreed accordingly. _____