## SUPREME COURT.

### SAMUEL HIDES agt. MARY HIDES.

*Divorce — When marriage and conveyance will be set aside as procured by fraud and undue influence — Code of Civil Procedure, section 1750.*

While a belief in spiritualism is not *per se* sufficient cause for setting aside a marriage and a conveyance of property, yet where a shrewd, designing, lewd and unchaste woman, in middle age, knowing that an old man who is deaf and living in seclusion is a firm believer in spiritualism, takes advantage of such belief, seeks his acquaintance, pretends to be a medium and to receive communications from spirits commanding that they marry and that the old man convey to her valuable property, claims to be a clairvoyant physician and to be able to cure his deafness, and by other fraudulent devices induces the old man to marry her and to convey to her the property, the marriage and conveyance will be set aside as procured by fraud and undue influence when the court is satisfied from all the evidence they were so procured.

*Schenectady Special Term, March, 1883.*

THIS was a suit to annul a marriage between plaintiff and defendant, and to set aside a conveyance to defendant by plaintiff at the time of the marriage, on the ground that the marriage was brought about and the conveyance obtained from plaintiff by defendant by means of fraud and undue influence.

The cause was referred to Hon. A. D. WAIT, who found the following facts and conclusions of law:

1. This suit was commenced October 19, 1880, and a copy of the complaint and a *lis pendens* filed in the clerk's office of Saratoga county on the same day. 2. On the 29th day of September, 1880, the plaintiff and the defendant Mary were married to each other at Saratoga Springs, in this state. 3. Before the marriage between plaintiff and defendant Mary, and on the same day the plaintiff by warranty deed, a copy whereof is annexed to the complaint, forming a part thereof, conveyed to said Mary, by the name of Mary

McMahon, a large and valuable piece of real estate situated in said county of Saratoga, described in said deed, which was recorded in the clerk's office of Saratoga county on the 30th day of September, 1880, at nine o'clock A. M., in book No. 152 of Deeds, page 219. 4. The premises so conveyed by plaintiff to defendant Mary are, with the spring thereon, very valuable, variously estimated from $13,000 to $100,000, and probably worth $25,000. 5. At the time plaintiff conveyed said lands to defendant Mary he had no property beyond what he so conveyed to her, except some thirty acres lying back of the piece he so conveyed to her, which thirty acres was worth from $1,500 to $3,000, and not to exceed $500 or $600 in personal property. 6. On the 29th of September, 1880, the plaintiff was the owner of, and had been for over twenty years the owner of, and resided upon, said premises he so conveyed to defendant Mary. 7. On the said 29th day of September, 1880, defendant gave plaintiff back a lease of a life estate in the premises he so conveyed to her, which defendant Mary caused to be recorded September 30, 1880, in book No. 152, page 222, two and a half hours after the deed from plaintiff to her was recorded. 8. That on said 29th day of September, 1880, the plaintiff was nearly seventy-five years of age, having been born November 15, 1805. 9. For five or six years prior to September 29, 1880, plaintiff was physically weak and feeble, and unable to do anything except little light chores, and to sit at the spring when not too cold, and hand out the water therefrom to those visiting it. 10. For five or six years prior to September 29, 1880, plaintiff had lived alone in a small, old house upon the premises he conveyed to defendant Mary, doing his own cooking. 11. Plaintiff's former wife died some twenty-two years ago. In 1870 his only child and daughter married one Abija Comstock, and lived with plaintiff in the house on the premises he conveyed to defendant Mary until some five or six years before September 29, 1880, when she and her husband moved to the village of Ballston, some distance away, although she had, down to about September 29, 1880, visited

him almost daily, making his bed and doing some work, and contributing by kind acts to make him and his home as comfortable as she could. 12. That plaintiff from the time he was five or six years old has been very deaf. 13. That on the 29th day of September, 1880, the plaintiff was and for many, over twenty-five years, had been a strong believer in what is commonly known as spiritualism, and believed that spirits of the dead communicated their wishes and desires, and what they knew to be for the benefit and good of the living to whom such communication from said spirits were communicated, through mediums. 14. Plaintiff claimed and believed that mediums were to be treated with the highest kind of regard, that if not obeyed something terrible would befall the person disobeying them and placed implicit confidence in what mediums said, even to the treatment of a child, which probably caused its death; such child then having a physician from which such treatment was concealed. 15. Plaintiff had for many years been in the habit of attending and had attended a great many spiritual seances, though for six or seven years, he had been so deaf he could not hear much of what was said, and had not so attended, and believed he had for the prior twenty-five years received a great many communications, through mediums, from the spirits of the departed. 16. The plaintiff in 1869 or 1870, prior to September 29, 1880, had dug upon the premises he conveyed to defendant Mary, a valuable mineral spring, commonly called the Franklin or Spiritualist spring. 17. Said spring was dug by plaintiff in consequence of, and pursuant to, what he believed to be spiritualistic communications, received by him through a medium from the spirit of Benjamin Franklin, received at many times during ten or fifteen years before he began to dig the same. It was 715 feet deep. The finding of such spring greatly increased his confidence in spiritualism and mediums. 18. Plaintiff had not seen defendant Mary until May, 1880, when she went to his spring and then made his acquaintance, claiming to be very modest and

bashful. 19. Defendant Mary claimed to be a clairvoyant physician, and had a sign as such, at a hotel in the village of Ballston, where she was stopping. 20. The third time defendant Mary came to plaintiff's spring she informed him she was a clairvoyant physician, that she had cured a great many men of deafness, and thought she could cure plaintiff. If he would allow her to try a few times she could tell whether she could or not; that she had cured an older man than plaintiff and made him hear perfectly well. Plaintiff consented to go to the hotel where defendant Mary was stopping and allow her to try. She manipulated his head, put her fingers into his ears and pressed them there some time; put her hands under his jaws and held them there some time calling such acts, by her, treatment. 21. The second time plaintiff went to call upon defendant Mary for treatment, she informed him she was sure she could cure him of his deafness. That she had created an action in his head that she perceived, and she was sure she could cure him. After some negotiations as to terms she said to him, " let me get my impression," shut her eyes, sat a few moments in that manner, then opened her eyes, from which defendant understood she was communicating with the spirits to get impressions, that they would and did impress her what to do, and how much she was to charge plaintiff. 22. When she opened her eyes she said to plaintiff, I will charge you fifty dollars a month for three months, and if I cure you $500. Plaintiff replied he couldn't give her that unless she could cure him, or unless her spirits would cure him. 23. Defendant Mary subsequently treated plaintiff in the manner hereinbefore stated for some time for twice a week for three or four weeks, finally telling plaintiff to come to Saratoga Springs, at an address she gave him, and receive treatment there. 24. The morning she directed plaintiff to come to Saratoga Springs, at about seven o'clock in the morning, defendant Mary appeared at plaintiff's house, told plaintiff that the spirits would not give her any rest at Saratoga and she had

come. They told her she must come to Ballston, that her mission was laid out for her; she had no peace, they were tormenting her all the while; that while she was with plaintiff his influence was very congenial to her and she felt she was at home again. 25. She subsequently "treated" plaintiff several times in the manner before described. 26. Defendant Mary finally proposed that she and plaintiff should get married. Plaintiff replied that he was too old. Defendant Mary took his wrist, examined it, saying after such examination he would live twenty years and be very happy. 27. Defendant Mary then told plaintiff the spirits said they must get married within two weeks, that they, the spirits, had done a great deal for her and plaintiff; had brought them together; that they had done all they could for them to bring them together; that she and plaintiff must be married within two weeks, and that if they did not they, the spirits, would not be responsible; that something would step in between if it went over that. Plaintiff asked her what would step in between; she replied she didn't know what, but the spirits could see further than she could; that the spirits said they would have two children, a boy and a girl. She talked during all this time about the spirits, telling plaintiff she saw the spirits around him time and time again; that the spirits said she must have a part of that property, that plaintiff must give her a deed. 28. Defendant Mary told plaintiff she was from one of the first families in Ireland; that her character was as pure as the white snow; that she was so pure and honest and virtuous that nobody could say anything against her; that her father was very rich, that he owned a great deal of land there; that her father's brother was a member of parliament and she had traveled through England, Ireland and France with a rich aunt. 29. Defendant Mary, September 18, 1880, took plaintiff to Troy for the purpose of procuring a suit of clothes. 30. Plaintiff proposed to have the deed of the lands in question made at Ballston where he resided. Defendant Mary told him the lawyers at Ballston were all against her and

they should go to Saratoga.   31.  Defendant Mary objected to
Mrs.  Comstock, the daughter of plaintiff, hearing of their
contemplated marriage, and Mrs. Comstock was not informed
of it.   32.  The evening before the deed in question was drawn
defendant Mary arranged with plaintiff that they should
next morning go separately to the cars and go to Saratoga
Springs.   33.  Defendant Mary took plaintiff to a lawyer with
whom he was unacquainted when the deed in question was
made out, she doing most of the talking relative thereto,
plaintiff not hearing much of the conversation.   34.  Defend-
ant Mary told plaintiff that the spirits said he must give her
the deed before they got married, and they must go and
get married.   35.  After the deed in question was executed
defendant Mary took plaintiff to a Catholic priest, who after
some conversation with her declined to marry them, when
she and plaintiff went to a Baptist minister and were mar-
ried.   36.  Plaintiff relied upon and believed the aforesaid
representations made to him by defendant Mary to be true,
and that spirits of the dead communicated to him, through
her as a medium, what she stated to him the spirits said, and
gave her the deed in question and married her because he so
believed, relying upon, and in consequence of such statements
and his belief and confidence, that they were true.   37.  Such
belief of plaintiff was designedly, falsely and fraudulently
induced by defendant Mary, by means of her relation to and
influence over plaintiff as a physician, and of her falsely claim-
ing to be a medium and to communicate to plaintiff what was
said by spirits, she well knowing plaintiff believed in spiritual
communications through mediums, believed she was a medium
and that such statements were true, and that plaintiff believed
what she said the spirits had said or directed had been com-
municated to him from spirits through her as a medium, and
relied upon the same as true.   38.  Defendant Mary herself
declared plaintiff was just like a child and she could do with
him as she pleased.   39.  That defendant Mary obtained such
deed from and married with plaintiff by means of and through

fraud and undue influence over him, by, through and in consequence of his old age, his condition, his feebleness and his belief in spiritualism, she fraudulently taking advantage thereof to obtain such deed and to induce plaintiff to marry her. 40. Before the marriage between plaintiff and defendant Mary she informed defendant she had been twice married, that her first husband was drowned and her second had died a natural death and she had no husband living. 41. A few days after plaintiff and defendant Mary were married defendant Mary began barricading the doors and windows of plaintiff's house, claiming she was afraid someone would come and take her out. 42. During the time defendant Mary was at plaintiff's she acted very strangely, was very angry, and one night dared plaintiff to get out of bed and settle the difficulty with her on the spot. 43. Defendant Mary remained at plaintiff's house about ten days or two weeks, and then left him and his house and has not since returned, and they have not since cohabited. 44. As early as 1874, defendant Mary claimed to be and acted as a clairvoyant; was traveling about from place to place telling fortunes and acting, or claiming to act, as a clairvoyant physician, and continued so to do at various places, Troy, West Troy, Saratoga Springs, Ballston, etc., down to the time of her marriage with plaintiff. 45. As early as 1874, defendant Mary was a lewd and unchaste woman, being guilty of living and cohabiting with men who were not her husband, and of public, lewd and indecent conduct. She continued to be a lewd and unchaste woman, and to so conduct herself down to the time of the marriage between her and plaintiff. 46. In April, 1874, defendant Mary began a suit in the supreme court, in the name of Mary McMahon against one John D. Lawrence, for breach of promise to marry her, and alleged that he had seduced and had carnal connection with her; defendant Mary in her complaint in that suit alleging, " That said defendant, taking advantage of the confidence plaintiff had in him by reason of said promise and promises, seduced and cohabited with this plain-

tiff, and plaintiff became and now is pregnant by said defend-
ant, and was so at the time defendant abandoned her." 47.
The complaint was verified by defendant Mary, April 13,
1874; answer verified May 11, 1874; judgment for defend-
ant perfected March 29, 1874, plaintiff not appearing. 48.
From about 1874 to about 1877 defendant Mary was living
and cohabiting with one Laundry, as husband and wife,
and sleeping with him. She subsequently stated to Lawrence
she had received a telegram that Laundry had been killed,
though he was, in fact, living to her knowledge, she telling a
man named Bowers "he was played out." She declared to
several persons she had been married to Laundry, and to some
that they were married at Burnt Hills, Saratoga county. 49.
Defendant Mary had a child by said Laundry. 50. About
1874, defendant Mary purchased a house and took title thereto
in the name of Mary Laundry, and gave back a mortgage for
a portion of the purchase-price under that name. 51. On the
26th of March, 1874, defendant Mary began a suit in justices'
court by the name of Mary Laundry against Aaron Vedder,
returnable April twenty-seventh, in which she personally
appeared and took part, and was sworn in her own behalf
under the name of Mary Laundry, and was also so sworn, in
the cause named, in the county court on appeal in June, 1874.
52. Laundry had been married some twenty-nine years ago to
a woman named Sophia Bell, and had never been divorced
from her. 53. Said Sophia Bell was living at the time of the
trial hereof. 54. That said Laundry left his wife in Michi-
gan in 1862; returned there in 1875. That, from 1862 to
1875, said Laundry had no communication with his wife or
she with him. 55. Said Alexander Laundry was living in
July, 1881. 56. In the summer of 1877, defendant Mary was
stopping at a house in Saratoga Springs with a man who
passed by the name of Charles Hendricks, cohabiting and
lodging with him as his wife, for some ten or fifteen days, and
claimed to be such. Said Hendricks was alive in 1878. 57.
The same summer defendant Mary was stopping at another

house in Saratoga Springs with said Hendricks, cohabiting with him as his wife some six weeks. 58. The same summer defendant Mary was stopping at another house in Saratoga Springs with said Hendricks, cohabiting and lodging with him as his wife for about two months, and claimed to be such. 59. Said Hendricks was living in June, 1879. 60. Said Charles Hendricks real name was Frederick B. Hendricks. In 1864, said Frederick B. Hendricks was married to one Margaret Ann Riley, who was living at the time of the trial hereof. 61. At one time in the summer of 1879 defendant Mary, while ostensibly engaged in telling fortunes, had connection with a man, whose name was not shown, in a small building or hut on the Indian camping ground in the village of Saratoga Springs. 62. In the summer of 1880, while defendant Mary was at Ballston, a man named Keyes frequently visited her in her room at night and remained until late hours. 63. In 1879, defendant Mary occupied a small wooden house or hut in the Indian encampment at Saratoga Springs, telling fortunes and claiming to act as clairvoyant; on several occasions men were seen to enter her house when it was not lighted as late as twelve or one o'clock at night, remain an hour or so and come out. 64. Defendant Mary, whose name then was Mary Brady, was on the 27th day of June, 1856, married to Michael McMahon, a laborer at Schenectady in this state, by a Catholic priest. 65. In 1874, defendant Mary declared to one Lawrence that McMahon, her first husband, was dead. 66. In 1874, defendant Mary, when she knew McMahon was living, informed persons she had been married to Laundry, and she passed under that name. 67. In March, 1875, about the twenty-seventh, the said Michael McMahon was living, and said Lawrence procured his attendance at Troy, before such dismissal of said Mary's complaint, for the purpose of using him or his testimony in the suit by said Mary against him, and said McMahon went in the direction of said Mary's house the morning before such dismissal. 68. Said Michael McMahon has not been heard of since he was at Troy in March,

Hides agt. Hides.

1875, by Patrick Kennedy, the husband of an aunt of said McMahon, after quite extended inquiries and search in various places, nor had Frank McMahon, a son of said Michael and defendant Mary, seen him since 1871, but had heard he was at Troy in March, 1875, at the Lawrence trial, and had not heard from his father since 1875, though he had inquired of some relatives, among others an uncle residing at West Troy, an uncle residing at Cohoes and an aunt at Green Island, all within fifty miles of Ballston, and of defendant Mary, all of whom told him they thought his father was drowned in 1875 and his body found in the Hudson river. That they had heard he was drowned but knew nothing about it. Neither of said uncles nor said aunt were called as witnesses, nor was defendant Mary so called. Some persons had told Kennedy they had seen McMahon, but he was not able to find him. 68a. That at the time of the marriage between the parties defendant had no husband living. 69. No evidence was given by any one that they had any knowledge of the death of said Michael McMahon or that he had not been heard from except by said Patrick Kennedy and Frank McMahon. 70. That on the 29th day of March, 1875, defendant, John D. Lawrence, recovered a judgment in the supreme court of this state, perfected in Rensselaer county clerk's office for $98.28 costs, of which before the commencement of this action a transcript was filed and said judgment docketed in Saratoga county October 13, 1880. 71. That plaintiff did not before the commencement of this action cohabit with defendant Mary as husband and wife, with a full knowledge of the facts constituting the fraud, and has not since the commencement hereof cohabited with her at all.

### Conclusions of Law.

That plaintiff is entitled to judgment: 1. That the marriage between the plaintiff and the defendant Mary, solemnized on or about September 29, 1880, be annulled and dissolved. 2. That the deed and conveyance from the plaintiff to the defend-

ant Mary, dated September 29, 1880, a copy whereof is annexed to the complaint recorded in the clerk's office of Saratoga county on the 30th day of September, 1880, in book No. 152 of Deeds, page 219, be vacated, set aside and altogether holden for naught, and that the clerk of Saratoga county enter upon the record thereof that " this deed is vacated and set aside by and pursuant to the judgment in the supreme court in the case of *Samuel Hides* agt. *Mary Hides alias McMahon*, entered in Saratoga county clerk's office on the     day of     , 188 ." 3. That the judgment of this court recovered against defendant Mary, by defendant Lawrence, on the 29th day of March, 1875, for $98.28, docketed in Saratoga county clerk's office on the 13th day of October, 1880, is not a lien upon the real estate described in the deed, so directed to be vacated and set aside. 4. That plaintiff recover of defendant Mary his costs of this action.

*L'Amoreux, Dake & Whalen*, attorneys for plaintiff.

*Edgar L. Fursman* and *Nathanial C. Moak*, of counsel.

*Neary & Martin*, attorneys for defendant.

*Charles Hughes*, of counsel.

The referee wrote the following opinion :

A. WAIT, *Referee.* — The plaintiff and the defendant Mary Hides intermarried in September, 1880, at Saratoga Springs, and on the same day of the marriage, but prior thereto, the plaintiff, in pursuance of an ante-nuptial agreement between them, conveyed to her by warranty deed certain real estate in Ballston Spa, the deed reciting that the same was " in consideration of the sum of one dollar and a marriage settlement between the parties hereto to him duly paid and contract of marriage carried out."

This suit was commenced in October, 1880, for the purpose of nullifying said marriage, on the grounds :

1st. That the plaintiff's consent to said marriage was obtained by fraud.

2d. That the defendant at the time of her marriage to the plaintiff had a former husband who was then living, and that her marriage with her former husband was then in force.

The complaint also sets up that said deed of real estate was fraudulently obtained by the defendant from the plaintiff, and judgment is prayed that said deed be therefore canceled and set aside.

The allegations of fraud in the complaint are controverted by the answer. On the subject of a former marriage it is averred in the complaint, upon information and belief, that the defendant Mary was, at and prior to the time of making and receiving said conveyance, and at the time of her marriage with plaintiff, a married woman, and then had, and still has a living husband from whom she has not been divorced, and at that time was, ever has been, and still is incapable of contracting a valid marriage with plaintiff, and that said marriage of the plaintiff and the defendant Mary was and is invalid and void.

The answer contains a denial of each of these allegations by the defendant, and an allegation upon her information and belief that at the time of her marriage with the plaintiff herein her former husband was dead ; and further alleges that at the time of her marriage with the plaintiff herein, the former husband of the defendant had absented himself for the space of five successive years and more, without being known to the defendant to be living during said time, although defendant during said time made constant and diligent search and inquiry for him.

Upon this question of a former marriage it was proved on the part of the plaintiff that the defendant Mary was married at Schenectady in June, 1856, to one Michael McMahon ; that four children were born to them, some of whom are now living; that they lived together until about 1861, when McMahon went to the war. He returned from the war and

was living as late as March, 1875, with relatives at and near Schenectady.

At this time defendant Mary resided at and near Troy, and though she undoubtedly knew that her husband was living within a few miles of her, she did not return to him but was living in open and notorious adultery with one Alexander Laundry, at Troy, Green Island and West Troy.

While thus living she conversed with the witness James Bowers about her husband (who was known as well by the name of "Mac" as McMahon). She said she did not care for him that he was "played out;" that when one man gave out it was good to have another, and when it was mentioned that she was not married to the man with whom she was living she did not deny it. This was in 1873 or 1874.

In the spring of 1873 she lived in a house on Green Island which she rented under the name of "Mrs. Mack," from the witness Nicholas Bulger. She described herself to him as a widow. Here she lived with Laundry, holding the apparent relation of wife to him.

During this time she claimed Laundry to be her husband although she knew her husband McMahon was living and she had not been divorced from him.

Soon after this she purchased under the name of Mary Laundry a house in West Troy of the witness John Mason, and she and Laundry lived there together, and were known to the neighbors as husband and wife. She failed to pay for the property and Mason took it back. She went to the house of Esther Perry, in Troy, and remained there two or three nights sleeping with Laundry. She declared to Mrs. Perry that Laundry was her husband, and that she had a child by him. She left Mrs. Perry's after remaining there two or three nights, but Laundry remained. She declared to David Butcher and Willard Hammond that Laundry was her husband. This was in 1874. She said she was married to Laundry at Burnt Hills, Saratoga county. In that year the defendant Mary commenced an action in the supreme court

against one John D. Lawrence, for seduction under promise of marriage. In her complaint after alleging the promise and breach, she averred that Lawrence "taking advantage of the confidence she had in him by reason of such promise seduced and cohabited with her and that she became and then was pregnant by him," and she demanded $5,000 for her damages. To the truth of this complaint she made oath the 29th of April, 1874.

In March, 1875, at the time fixed for the trial of that action, Michael McMahon, the husband of the defendant Mary, was produced in court, and she suffered judgment to be taken against her by default. On the morning of the trial McMahon was seen in Troy, and started to go away, but no further account of him appears from the evidence on the part of the plaintiff.

In the same year the defendant Mary again lived with Laundry as his wife, and continued to assert that he was her husband; and as late as October, 1875, she was living with him, and traded with Willard Hammond under his name. Prior to this time, on the 26th of March, 1874, the defendant Mary began a suit in justices' court by the name of Mary Laundry against Aaron Vedder, returnable April twenty-seventh, in which she personally appeared and took part, and was sworn in her own behalf under the name of Mary Laundry; and was also so sworn, in the cause named, in the county court on appeal in June, 1874.

It was proved that Laundry had been married some twenty-nine years ago to a woman named Sophia Bell, and had never been divorced from her, and that said Sophia Bell was living at the time of this trial; that Laundry left his wife in Michigan in 1862 and returned there to her in 1875; and that said Laundry was living in July, 1881. It does not appear that Laundry held, and it was admitted on the trial that he did not hold, any communication with his wife Sophia from 1862 to 1875, or she with him.

In the summer of 1877, the defendant Mary was stopping

at a house in Saratoga Springs with a man who passed by the name of Charles Hendricks, cohabiting and lodging with him as his wife for some ten or fifteen days, and claimed to be his wife. Hendricks at the time was the proprietor and manipulator of a Punch and Judy show at the " Indian Encampment " in that village, and the defendant was engaged in the occupation of " fortune telling " at the same " Encampment."

The same summer the defendant Mary was stopping at another house in Saratoga Springs, cohabiting with Hendricks as his wife some six weeks. And the same summer she was stopping at another house in Saratoga Springs with said Hendricks, cohabiting and lodging with him as his wife for about two months, claiming to be the wife of Hendricks.

Hendricks was living in June, 1879. His real name was Frederick B. Hendricks. It was proved that in 1864 said Hendricks was married to one Margaret Ann Riley, who was sworn as a witness on the part of the defendant on this trial.

There was no further evidence given of any marriage, or any pretended marriage, of the defendant Mary with anyone, except as to her marriage with the plaintiff in this case.

If it be true that the defendant Mary married Laundry at the time and under the circumstances disclosed by the evidence in this case, as she represented and claimed she did, she was guilty of bigamy. It appears that she then knew that her lawful husband, Michael McMahon, was then living. Such marriage, if it took place as claimed by the defendant Mary, was contracted in violation of the provisions of the statute on the subject of marriage, and was absolutely void. Both Laundry and herself, under the evidence in this case, were legally precluded from entering into such a contract.

There was no ceremonial marriage between them proved, and their cohabitation in the beginning seems to have been meretricious as claimed by defendant's counsel. But they may, as the defendant Mary claimed, have entered into a contract of marriage.

Marriage with us is but a civil contract, and no ceremonial

is necessary to create the relation. A contract of marriage made "*per verba*" *de presenti* amounts to an actual marriage, and is valid when there is no legal impediment in the way of the parties to prevent their entering into such contract. And it is competent to prove marriage by cohabitation, acknowledgment of the marriage by the parties themselves, reception of them as man and wife by their relatives and neighbors and common repute (*Ogara* v. *Eisenlohr*, 38 *N. Y.*, 298, *and cases cited*).

If the defendant, as she claimed, contracted marriage with Laundry she did not regard it as in the way of her entering into another contract of marriage with Lawrence while her marriage with Laundry was in full force.

Under the contract with Lawrence, and in reliance upon it, the defendant was, as she claimed, seduced and became pregnant. She was, as it appears, ready and willing to enter into the marriage relation with Lawrence at that time, and would have done so but for his refusal to carry out the contract.

Her subsequent cohabitation with Hendricks at Saratoga Springs in the character of a wife, under the circumstances detailed in the testimony, was, I think, unquestionably meretricious, and her claims and pretenses that she was his wife were untrue.

Assuming that the defendant Mary at the time was free to enter into the marriage relation with Hendricks, and in fact did so, such marriage was absolutely void, as Hendricks at the time was a married man, and his wife was then living and from whom he had not been divorced.

The plaintiff fails to establish the allegations of the complaint that the defendant Mary at the time of her marriage with the plaintiff was a married woman and had a living husband from whom she had not been divorced, and was therefore incapable of contracting a valid marriage with the plaintiff, unless it appears from the evidence that her former husband, McMahon, was living at the time of such marriage.

McMahon was in Troy in March, 1875, as a witness in the

suit of his wife against Lawrence, and was seen there the
morning before the dismissal of the complaint in that action.
No further evidence was given on the part of the plaintiff as
to the existence of McMahon subsequent to that time:.

The witness Frank McMahon, a young man about twenty-
three years of age, son of the defendant Mary, testified on her
part that he last saw his father, Michael McMahon, in 1871;
that he saw him then in the street in the city of Troy; that
he heard of his being in Troy in 1875, and of his disappear-
ance at that time.

This witness was not in Troy in 1875, but was absent from
that city in the years 1873, 1874 and 1875, and returned there
in 1876. On his return in 1876, as he testified, he made
inquiries to find his father. He inquired of persons who had
known his father, and of his uncles and aunt (brothers and
sister of his mother), residing at Troy and West Troy, or in
that vicinity. They informed him that his father was drowned
in 1875, and his body had been found in Albany in the
Hudson river.

His uncle informed him that his father was in Troy on a
" tare," or " spree," there the last they saw of him. This
witness testified that he also inquired of his mother and she
told him the same story. On his cross-examination he testi-
fied that the relatives of whom he made inquiries did not say
that they knew his father was drowned, but that they thought
he was ; that they had heard so, and heard that he was buried
by the city authorities of Albany ; that his aunt, who resides
on Green Island, of whom he inquired in 1876, said that his
father was there on a " spree," and left there to go over the
river, and that was the last she ever saw or heard of him.

Patrick Kennedy, a witness sworn on the part of the plain-
tiff, testified, on his cross-examination, that he had resided in
the town of Glenville, about four miles from the city of
Schenectady, about twenty-three years ; that after McMahon
returned from the war he worked in Schenectady, or in that
vicinity ; and when out of work made it his home with the

witness, usually in the winter time; that the witness knew of McMahon's going to Troy to attend the Lawrence trial in 1875, as a witness; he was then working for Mr. Eckrich, a farmer who lived near the witness.

At the time McMahon left to go to Troy on that occasion he left all of his clothes except those that he wore at the house of the witness. He also left some money and a bank book in charge of the witness, who still retains the same. McMahon never appeared to claim the same; and the witness has not seen or heard anything of him since that time.

The witness was an uncle of McMahon, and he and another uncle, living near there, some time after McMahon went away to Troy, as stated, made efforts at Troy and vicinity to find him, and put an advertisement in the Troy Times, and consulted the police and had them make inquiries for him, and searched for him in all the places about Troy where they thought he would be likely to be found or heard of, but got no tidings of him. Another uncle of McMahon, residing at Elmira, was at the house of the witness in July last and they spoke of the absence of McMahon, but neither of them knew anything of him since he went to Troy in 1875.

This witness subsequently made inquiries of people at different times, and some said they had seen him in Troy, and on further inquiry found it was a lie or mistake. This is substantially all of the evidence in the case upon this question. Upon this issue under the pleadings the plaintiff held the affirmative, and his relation to the question was unchanged upon the trial (*Banker* agt. *Banker*, 63 *N. Y.*, 409, 418; *Hinmon* agt. *Hood*, 62 *N. Y.*, 448, 455). The plaintiff proved that the defendant Mary intermarried with Michael McMahon, June 27, 1856, and that McMahon was alive March 27, 1875, and gave no further evidence upon the subject, reposing upon the presumption of the continuance of McMahon's life.

As a general rule the law presumes the continuance of life, and the death of neither husband or wife will be presumed

until an absence of seven years without being heard from (*O' Gara* agt. *Eisenlohr*, 38 *N. Y.*, 301).

The defendant's counsel insist that such presumption in a case of this character is balanced by the presumption against the commission of crime and immorality, and hence that the plaintiff did not make out a *prima facie* case, demanding evidence on the part of the defendant to overcome it.

Justice PRATT, in his opinion in the case of *Clayton* agt. *Wardell* (4 *Comst.*, 240, 241), says that between these conflicting presumptions courts of justice will not decide; that the principles growing out of the presumption of innocence have been uniformly extended to all cases calling for their application. Thus, in the case of *The King* agt. *The Inhabitants of Twining* (2 *Barn. & Ald.*, 386) the same principle was applied. The case involved simply the settlement of a pauper. A woman had been married to a soldier, who soon after left for the East Indies. Within twelve months the woman married again and the question turned on the validity of the second marriage. It was held that the death of the first husband before the second marriage might be presumed and the latter was valid.

BAILEY, J., deemed it a case of conflicting presumption; the presumption of the continuance of life being balanced by the presumption against the commission of crime. The same rule has been applied in a civil action for libel where the defendant had charged the plaintiff with the crime of bigamy and attempted to justify by proving the truth of the charge (*Weimath* agt. *Harmer*, 8 *Carr & Payne*, 695).

Justice HARRIS, in his opinion in the case of *Clayton* agt. *Worden* (4 *Comst.*, 237), says that when there is a conflict of presumptions the rule is that that must yield which has the least degree of probability to sustain it. The presumption of innocence and against the commission of crime and immorality does not always prevail in the conflict (*O' Gara* agt. *Eisenlohr*, 38 *N. Y.*, 302). Presumptions of fact are but inferences drawn from other facts and circumstances in the

case and should be made upon the common principles of induction (*Id.*, 303).

The defendant Mary was a party to two "ceremonial" marriages, one with McMahon and the other with the plaintiff. She claimed to have married Laundry at a time and under circumstances making such marriage criminal and immoral. She knew that McMahon was then living, and did not seem to regard her marriage to him as any hindrance to her marrying another man. In those days she seemed to regard the marriage relation as one of mere temporary convenience that might be assumed and discarded *ad libitum.* It may be that in this case the presumption of innocence and against the commission of crime and immorality should prevail over the presumption invoked by the plaintiff of the continuance of McMahon's life. But the defendant very properly, as I think, did not choose to leave the question to be determined upon these conflicting presumptions unaided by evidence to show the probable death of McMahon.

Assuming that the plaintiff established *prima facie* that McMahon was alive, based upon the legal presumption of the continuance of life, and that such presumption was not overcome by the conflicting presumption of innocence and against the commission of crime and immorality, it was competent for the defendant to rebut such presumption and answer such *prima facie* case by evidence from which it could be reasonably presumed that he was in fact dead prior to the marriage in question.

When there is no definite evidence of the fact of death, as in the case of a person absent and unheard of, the law receives all proper evidence of the circumstances which can throw light upon motive, cause and casualty, and in civil cases inquires not whether it is possible that he can be alive, but whether the circumstances do not warrant that strong probability of death upon which a court of justice should act (*Merritt* agt. *Thompson*, 1 *Hill*, 550, 555, *and cases cited*). It appears from the evidence that at the time McMahon was last seen alive he was

intoxicated and was near the Hudson river at Troy. He had left his place of residence temporarily to go to Troy in obedience to a subpœna to attend as a witness on the part of the defendant, on the trial of the suit brought by his wife against Lawrence.

He had no other business calling him away, and apparently intended to return to his residence, in the vicinity of Schenectady, as soon as he was relieved from further attendance as such witness at Troy.

When subpœnaed he was at work for a farmer near the residence of Kennedy, his life-long friend and relative. He had boarded in the family of Kennedy for several winters, and made it his home there when out of work. His bank-book and his clothes were there. He took nothing away with him except the clothes he wore and a few dollars in money. He had no property except the sum of thirty-five dollars deposited in a Schenectady bank, and his wearing apparel and such money as he had with him to bear his expense when he started for Troy.

His relations with Kennedy and his family were entirely friendly and agreeable. It is strange that he did not return to his old friend Kennedy, or that he should absent himself, if living, without communicating with him and calling for his money and his clothing. His sudden and mysterious disappearance, being intoxicated when last seen alive near the river in proximity to danger, is, under the circumstances, strongly suggestive of accident and death. Some years prior to this time McMahon being drunk fell from a culvert and was badly hurt and was carried on a door to his home, then on Green Island. McMahon had not lived with his wife, nor had they had any intercourse whatever with each other, for some years before this time, though being but a few miles apart.

Whatever affection he may have had for his wife at the time of their marriage, and when they were living together in the years before he went to the war, would seem to have been entirely extinguished long before this time; and how-

ever disagreeable it may have been for him to have obeyed the requirements of a subpœna to attend a trial in which his wife claimed to have been seduced under a promise of marriage to another man and to be pregnant from her illicit intercourse with her alleged seducer, it is not probable that he was so affected by the circumstances as to commit suicide. And there is nothing in the circumstances connected with McMahon, as shown by the evidence, from which it may reasonably be inferred that he came to his death by suicide. Being habitually addicted to the use of ardent spirits he would be very likely to do as he did, indulge intemperately in their use on that occasion and become intoxicated.

The unavailing inquiries and search that was made for him by his friend Kennedy soon after his disappearance and subsequently. The fact that he has not been heard of since by those who would have been likely to have heard of him if alive. The repute and belief among his friends and relatives that he is dead, and the circumstances surrounding McMahon and connected with his departure and disappearance warrant in my opinion that strong probability of his death upon which a court of justice should act. The rumor which was credited among his friends and relatives soon after his sudden disappearance that he was at that time drowned in the Hudson river, was, I think, probably well founded. Upon the whole evidence in the case bearing upon the question it does not appear that McMahon was alive at the time of the marriage of the defendant Mary with the plaintiff. There was no evidence that she knew or believed McMahon to be living at that time. But on the contrary, I am satisfied from the evidence that he was in fact dead prior to that time, and that the defendant Mary fully believed when she married the plaintiff that her former husband, McMahon, was dead.

It remains to be determined whether the plaintiff is entitled to the relief prayed for, on the grounds set forth in the amended complaint involving fraud.

It is alleged therein: 1st. That on the 29th day of Sep

Hides agt. Hides.

tember, 1880, the plaintiff and defendant Mary intermarried at Saratoga Springs. 2d. That prior to said marriage, as an inducement thereto and as the basis thereof, the defendant Mary stated and represented that she was a pure and virtuous woman, with a character unblemished and above reproach. 3d. That the spirits had commanded her or directed her, she being a medium, to inform the plaintiff that the spirits had commanded and directed her and the plaintiff to marry each other; and had commanded the plaintiff to convey to her the real estate specified in the complaint. 4th. That the plaintiff relied and acted upon said statements, and believed the same to be true; and he, the plaintiff, had no knowledge or information to the contrary when he intermarried as above stated. 5th. That before said marriage and on the same day the plaintiff, in consideration of said marriage and of said representation and statements by the defendant Mary, by warranty deed, duly executed and delivered, did convey to said defendant Mary, by the name of Mary McMahon, a large and valuable quantity of real estate, a copy of which deed is annexed to the complaint and is a part thereof. 6th. That the defendant Mary represented herself as a spiritual physician, and for some time before said marriage pretended to doctor plaintiff for deafness under the direction of spirits. 7th. That plaintiff is upwards of seventy-four years of age, and for years last past has been feeble and infirm in health; and for many years has been a believer in what is commonly known as spiritualism; and believed that spirits of the dead communicated their wishes and desires, and what they knew to be for the benefit and good of the living, to whom such communications from said spirits were communicated through mediums. 8th. That plaintiff married defendant Mary, and transferred such real estate to her in consequence of her representations to him as aforesaid, and believing the same to be true; whereas, in truth and in fact, the same were false and untrue. 9th. That the real estate so conveyed was, and is of the value of $20,000, and embraced nearly all the property the plaintiff

then owned or possessed. 10th. That at the time of said marriage the defendant Mary was a lewd, unchaste and impure woman, of ill-repute and bad character. 11th. That the plaintiff was induced to, and did ¦marry the defendant Mary, and conveyed to her said real estate, relying solely upon her said representations. 12th. That all of said representations were and are false, and were known by defendant Mary to be false when made.

After a careful consideration of all of the evidence in the case in regard thereto, I am satisfied that each of the foregoing allegations of the complaint is substantially proved.

The defendant Mary was present on the trial at some of the hearings and was at liberty to take the stand as a witness and give her version of the way, the courtship, or *modus operandi,* by which her marriage to this old man and the deed of real estate from him to her was brought about and obtained. But she was not called as a witness and the testimony of the plaintiff is uncontradicted. In her answer, which is verified by her oath, she denies specially the several allegations of the complaint on the subject.

And she further denies, in the answer, that she was at the time of her marriage with said plaintiff, *or for any time previous thereto,* had been a lewd, unchaste or impure woman, or of ill repute or of bad character.

When she verified the answer she knew that denial was untrue. If at the time of her marriage with the plaintiff and shortly prior thereto, when she represented to him that she was virtuous and pure "as the white snow," she was not then in fact unchaste and impure, there had been a renewal and change in her character extraordinarily sudden and remarkable. Such "new birth" in the light of the evidence beggars belief. This defendant further answering the complaint denies that all or any of the alleged representations therein set forth were or are false, excepting only the alleged representations that she, the defendant, was a spiritual physician and that spirits had commanded her and directed her, she being a medium, to

inform the plaintiff that the spirits had commanded and directed her and the plaintiff to marry each other, and had commanded the plaintiff to convey the real estate specified in the complaint to her, and as to the said alleged representations the defendant denies that she made the same. "*And upon her information and belief, alleges that all times prior to the time mentioned in the amended complaint at that time, and ever since the spirits, if any, were and are otherwise occupied than in interfering with or directing mundane transactions concerning either matrimony or real estate.*"

The uncontradicted evidence shows that she did in fact make such representations, and the foregoing allegations of her sworn answer, shows that according to her information and belief those representations so made by her were false. She had practiced as a "clairvoyant physician" and "fortune-teller" for years, but it is not claimed in her answer and does not appear from the evidence that at any time except in her ante-nuptial "treatment" of and interviews with the plaintiff that she assumed to be a spiritual medium, or pretended to have any faith in "spiritualism."

So far as she was informed and believed, the spirits, "if any," have always been otherwise occupied "than in interfering with or directing mundane transactions concerning either *matrimony* or *real estate.*"

This defendant alleges in her answer as a separate defense, upon her information and belief, that subsequent to the intermarriage of the plaintiff and the defendant, and before the commencement of this action the plaintiff voluntarily cohabited with this defendant as her husband, with a full knowledge of the facts constituting the fraud, if any, alleged in the amended complaint.

There is an entire failure of proof to sustain this defense. The evidence shows otherwise. This old man was circumvented and entrapped into this marriage, and his consent thereto obtained by the false and fraudulent representations and devices of the defendant referred to. But, nevertheless,

it is strenuously insisted by the defendant's counsel that such a
case as this is not within the purview of the statute, provid-
ing that an action may be maintained to procure a judgment
declaring a marriage contract void, and annulling the mar-
riage when the consent of one of the parties was obtained by
fraud, and that the equity power of the court, independent of
the statute, is inadequate to relieve the plaintiff from a contract
of marriage thus obtained.

In *Griffin* agt. *Griffin* (47 N. Y., 138), it is said, by justice
RAPALLO, that the court of chancery of this state has in some
cases entertained bills to declare the nullity of marriages,
independently of any statute conferring jurisdiction. But
these were cases in which the marriage was sought to be
declared void for some cause for which chancery had power
to cancel or avoid all contracts, such as lunacy *or fraud*, and
it was held that the marriage contract was not excepted from
the operation of this general jurisdiction; and that if it was
not exercised by the court of chancery in England in matri-
monial cases, it was not for want of jurisdiction, but because
other tribunals existed there competent to afford full relief.
But in all other cases it must be conceded that the jurisdiction
of the court of chancery of this State in actions for divorce,
either on the ground of nullity or for cause arising subse-
quent to the marriage, is founded wholly upon the statutes
(*Perry* agt. *Perry*, 2 *Paige*, 506 ; *Burtis* agt. *Burtis*, *Hopk.
Ch.*, 550). Prior to 1787 there was no tribunal in this state
authorized to grant a divorce, and the only remedy of
aggrieved individuals in matrimonial cases was by application
to the legislature for relief.

In 1787 an act was passed reciting that it was more advis-
able for the legislature to make general provisions for such
cases than to afford relief to individuals without a proper trial,
and, therefore, conferring jurisdiction upon the court of
chancery to decree divorces in cases of adultery. This was
the only cause of divorce until the year 1818, when divorces,
on the application of the wife, on the ground of cruel treat-

ment was authorized, and in 1824 the husband was enabled to sue for divorce on the same ground.

In 1820, in *Weightman* agt. *Weightman* (4 *Johns. Ch.*, 343), chancellor KENT decreed the nullity of a marriage on the ground of lunacy of one of the parties at the time of its alleged solemnization; and in 1825, in *Terlat* agt. *Gojou* (*Hopk. Ch. R.*, 478), chancellor SANFORD decreed a marriage void for fraud. Both of these cases were based upon the general jurisdiction of the court of chancery in cases of lunacy and fraud and not upon the jurisdiction of ecclesiastical courts. Accordingly, in *Burtis* agt. *Burtis* (*Hopk. Ch.*, 557), decided also in 1825, chancellor SANFORD decided that the court of chancery had no jurisdiction to annul a marriage on the ground of impotence, holding that the statutes of this state, before referred to, are founded upon the supposition that the causes of divorce which they define were not causes of divorce by any pre-existing law in force in this state, and that they could not be regarded as an adoption of the English ecclesiastical law on the subject of divorce, but as conferring power only in the cases which they specify. By the Revised Statutes the power of the court of chancery on the subject of divorces was enlarged.

Article 2 of title 1, chapter 8, part 3, entitled "of divorces on the ground of the nullity of the marriage contract," enumerates five causes, for which, if they existed at the time of the marriage, the chancellor may declare void the marriage contract, viz.: 1st. Either of the parties not having obtained the age of legal consent. 2d. Either of them having a former husband or wife living. 3d. One of them being an idiot or lunatic. 4th. Consent having been obtained by fraud. 5th. Physical incapacity of either party. Some of the cases here enumerated were causes which rendered the marriage void at common law, and on which the court of chancery had already assumed jurisdiction. Other new causes not formerly cognizable in chancery.

The section was framed, as appears by the revised notes,

in view of the decisions in *Weightman* agt. *Weightman*
(4 *Johns. Ch.*, 343) and *Burtis* agt. *Burtis* (*Hopk.*, 557), and
the revisers refer to the latter case as establishing that the
whole jurisdiction of the court of chancery in relation to mar-
riage (*except when the contract is void on the same grounds on
which other contracts may be avoided*) is conferred and lim-
ited by statute, and they criticise as extra judicial the remarks
of chancellor KENT in *Weightman* agt. *Weightman* as to the
power of the court of chancery to annul incestuous marriages,
and refer to the fact that up to the time of the revision of the
statutes there was no law of this state defining or prohibiting
incestuous marriages. From this review it will be seen that
in some actions for nullity the jurisdiction of chancery was
derived wholly from the statutes.

Yet in others it existed independently of the statutes and
as a part of the original jurisdiction of the court. By the
constitution of 1846, the jurisdiction formerly rested in the
court of chancery became vested in the supreme court.

If there be any doubt of the power of the supreme court
in the exercise of equity jurisdiction, independent of statute,
to adjudge a marriage contract void obtained by fraud, the
power to so adjudge is expressly conferred upon the court by
statute re-enacted in the Code (*Sec.* 1743).

The plaintiff should have judgment declaring the marriage
in question void, and annulling the same if it is established by
the evidence that his consent to the marriage was obtained
by fraud.

All marriages procured by force or fraud or involving pal-
pable error are void, for here the element of *mutual consent*
is wanting so essential to every contract.

The law treats a matrimonial union of this kind as abso-
lutely void *ab initio*, and permits its validity to be questioned
in any court at the option, however, of the injured party, who
may elect to abide by the consequences when left free to give
or withhold assent. Force implies a physical restraint of the
will; *fraud, some deception practiced whereby an unnatural*

Hides agt. Hides.

*state of the will is brought about (Schouler on Husband and Wife, sec.* 27). Lord HARDRICKE in his enumeration of frauds for which equity will grant relief (2 *Ves.*, 155) says: "First fraud, *dolus malus,* may be actual, arising from facts and circumstances of imposition, which is the plainest case."

*An actual* or *positive* fraud is the intentional and successful employment of any cunning, deception or artifice used to circumvent, cheat or deceive another (1 *Story Eq. Jur., sec.* 186).

Story, in his "Equity Jurisprudence" (*vol.* 1, *sec.* 222), says: The general theory of the law in regard to acts done and contracts made by parties affecting their rights and interests, is that in all such cases there must be a free and full consent to bind the parties. Consent is an act of reason accompanied with deliberation, the mind weighing as in a balance the good and evil on each side.

And, therefore, it has been well remarked by an able commentator upon the law of nature and nations that every true consent supposes three things: First. A physical power. Secondly. A moral power; and, Thirdly. A serious and free use of them. And Crotius has added: That what is not done with a deliberate mind does not come under the class of perfect obligations, and hence it is that if consent is obtained by meditated imposition, circumvention, surprise or undue influence, it is to be treated as a delusion and not as a deliberate and free act of the mind.

For although the law will not generally examine into the wisdom or prudence of men in disposing of their property or in binding themselves by contracts or other acts, yet it will not suffer them to be entrapped by the fraudulent contrivances or cunning or deceitful management of those who purposely mislead them.

The concealment by defendant before her marriage of her previous unchaste character, or the false representations made by her inducing the plaintiff to believe her chaste, are not, it, seems, such a fraud as will support a judgment declaring a marriage void.

It was so held in the supreme court of Wisconsin in a recent case under a statute similar to ours (*Varney* agt. *Varney*, 23 *Alb. Law Jour.*). It was so held in Massachusetts (*Reynolds* agt. *Reynolds*, 3 *Allen*, 605).

This doctrine seems to have been uniformly sustained by the courts whenever the question has been raised (*See cases cited by judge* TAYLOR, *in Varney* agt. *Varney*).

Justice BIGLEOW, in *Reynolds* agt. *Reynolds* (3 *Allen*, 605), says: "While marriage by our law is regarded as a purely civil contract, which may well be avoided and set aside on the ground of fraud, it is not to be supposed that every error or mistake into which a person may fall concerning the character or qualities of a wife or husband, although received by disingenous or even false statements or practices, will afford sufficient reason for annulling an executed contract of marriage.

"In the absense of force or duress and where there is no mistake as to the identity of the person, any error or misapprehension as to personal traits or attributes, or concerning the position or circumstances in life of a party is deemed wholly immaterial and furnishes no good cause of divorce. Therefore no misconception as to the *character*, *fortune*, *health* or *temper*, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities which do not constitute the essential material elements on which the marriage relation rests.

"The great object of marriage in a civilized and christian community is to secure the existence and permanence of the family relation and to insure the legitimacy of offspring."

Bishop, in his work on Marriages and Divorce, concurs fully in this view (*Id.*, sec. 168), and holds "that the nature of the marriage contract forbids its validity to rest upon any stipulations concerning these accidental qualities.

In *Klein* agt. *Wolsohn* (1 *Abb. New Cases*), it was held that a divorce cannot be granted for the husband's fraud in inducing the marriage by false representations as to his

character and property. In that case the plaintiff alleged that she was induced to consent to her marriage by certain representations made to her by the defendant which she believed at the time of her marriage to be true.

The representations were that he was a man of good character, and was worth $15,000, and from his income he could support himself and plaintiff. Whereas, in fact, he was a man of bad character and was not worth the amount he claimed, and had no property or means. That upon discovering the falsehood of the statements she refused to live with him. The court held that the fraud for which a court of equity would be justified in decreeing a dissolution of the marriage contract was clearly not of that character. And that the marriage is not to be annulled upon every ground of false representation which was sufficient to cancel an ordinary contract.

Following the doctrine of the authorities cited, I must hold that the representations of the defendant as to her chastity and purity, her pedigree, condition in life and personal qualities however false, are immaterial. If the plaintiff's claims for relief rested solely upon such a foundation it could not be sustained. That would not constitute fraud within the meaning of the state, and however improvident and unhappy such a marriage might be, the law would hold the aggrieved party to the contract thus obtained. But the claim for relief in this case, as I view it, stands upon other and more substantial grounds. The evidence shows that the defendant was unable to obtain and did not obtain the consent of the plaintiff to the marriage and the deed of the property, which she coveted, by means of such false pretenses alone.

It was not because the defendant induced the plaintiff to believe that she was a virtuous and honest woman and of unblemished reputation and possessed the attributes of a spiritual medium that the plaintiff consented to the contract. It was by means of the false and fraudulent representations of the defendant that through her, as such medium, the spirits had

commanded and directed their marriage, and had commanded the plaintiff to convey to her the real estate, that the plaintiff's consent to such marriage and conveyance of property was obtained. That was the determining cause of the contract. Without the aid of that artifice it is evident that the plaintiff would not have yielded to the overtures of the defendant. She undoubtedly knew of his strong belief in and reliance upon so-called spiritual communications, as it was a matter of common notoriety at Ballston Spa. She was no novice. She had had much experience as a " fortune-teller " and otherwise, and availing herself of her cunning and craft she took undue advantage of the plaintiff's religious belief, and by the false representations alluded to entrapped and controlled him. This, as I regard it, was an atrocious fraud, and the case as to the marriage contract is fully within the meaning of the statute, and is a case in which the benign jurisdiction of the court can be successfully invoked for the relief demanded in the complaint.

The deed should also be canceled, as it is not merely tainted with but was steeped in the same fraud by which the marriage contract was obtained. A deed given in consideration of a marriage procured by fraud and the execution of which was obtained by the devices practiced by the defendant in this case cannot well be said to have been given for a meritorious consideration.

I cannot agree with counsel for defendant that as the marriage was the consideration of the deed and the parties were in fact married and cohabited together, and the plaintiff cannot return or pay back what he has received or enjoyed, the deed must therefore stand.

It is not claimed that the defendant became pregnant by such cohabitation or suffered any special injury therefrom. By the dissolution of the marriage contract the defendant is substantially restored to the same condition in which she was before the marriage. And that will suffice in a case of this character.

The law cares very little what the loss of the fraudulent party may be, and it only requires the injured party, as far as he can, to undo what had been done in the execution of the contract. " This is all the disfrauded party can do and all that honesty and fair dealing require of him. If this fail to extricate the wrong-doer from the position that he has assumed, it is in no sense the fault of his intended victim, and upon the principles of eternal justice whatever consequences may follow should rest on the head of the offender alone" (*Per* BEARDSLEY, *J.*, *Mason* agt. *Bovelt*, 1 *Denio*, 69; *approved by court of appeals*, *Hammond* agt. *Pennock*, 61 *N. Y.*, 145, 153).

There should be judgment for the plaintiff annulling the marriage and canceling the deed in question.

A motion was made at Schenectady special term held by LANDON, J., for confirmation of the report so far as it directed that the marriage between the parties be annulled. It was so confirmed, Mr. justice LANDON writing the following opinion :

LANDON, *J.* — Motion for judgment to annul the marriage between the parties. It clearly appears by the evidence upon which the referee bases his report, that the plaintiff's consent to this marriage was obtained by fraud. He was seventy-four years of age, and for many years had been a believer in the fact and the authority of spiritualistic communications made to himself through the agency of alleged mediums.

Important events in his own experience had occurred, as he believed, through such influence, and these had strengthened and confirmed his belief. The defendant, whose character as disclosed by the evidence was infamous, sought and made his acquaintance in the assumed character of a clairvoyant physician and spiritual medium. She soon gained his confidence, and then she represented to him that the spirits had laid out her mission for her ; that they had brought the plaintiff and herself together; that they must be married within two weeks, and if they did not marry within that time

the spirits would not be responsible, but something mysterious would happen ; what, she did not know, but the spirits did ; that she saw the spirits around him time and time again, and they said he must give her a deed of a part of his farm. By such methods she subjected his will to her own and he gave her the deed she requested of property valued at $25,000 and on the same day married her. He soon discovered the fraud when his cohabition with her ceased, and this action was commenced. His consent was given under the delusion that the authority which he held in the highest awe and reverence commanded him to give it, and would be gravely offended if he did not. She created that delusion by falsely representing that the spirits gave the command. That his mind was predisposed by the faith of many years to a readiness of belief in the truth of such representations made him, it is true, the more easily a dupe and a victim, but it does not make the grossness of the deception less nor accord to the imposter any protection.

It may be that a person of ordinary prudence would not have been deceived by such representations, but the law does not out-law from its protection the old, the weak and the infirm.

A pretense, says Mr. Bishop (2 *Cr. L.*, secs. 432, 436), calculated to mislead a weak mind, if practiced on such a mind, is just as obnoxious to the law as one calculated to overcome a strong mind if practiced upon it.

Besides, ordinary prudence is a flexible term and we cannot say that any other person of average capacity would not, under similar circumstances, have been deceived by such representations provided his spiritual or religious belief was of the same kind and intensity as the plaintiff's. Our law prescribes no religion, but tolerates all and condemns none, and therefore the plaintiff's case suffers no detriment because his religious belief exposed him to the arts of the defendant.

The Code of Civil Procedure (*sec.* 1750) authorizes an action to annul a marriage on the ground that the consent of one of

the parties thereto was obtained by fraud, provided the parties have not voluntarily cohabited as husband and wife after discovery of the fraud. This is but a formulated expression of the equity power of the courts. The cases in our own courts show that the fraud which will lead the court to annul a marriage must be such as shocks the sense of fairness and is successful by its very audacity and baseness (*Scott* agt. *Shufelt*, 5 *Paige*, 43 ; *Ferlot* agt. *Gojon*, *Hopk.*, 478 ; *Sloan* agt. *Kane*, 10 *How.*, 66 ; *Clarke* agt. *Clarke*, 11 *Abb. Pr.*, 228 ; *Klein* agt. *Wolfsolm*, 1 *Abb. N. C.*, 134).

Tested by this stringent rule, I think this marriage should be annulled. Because of the same fraud the deed should be set aside. The report is confirmed, the facts found by the referee approved, and judgment, as advised by him, directed.